(No. 35617.-

HOLDEN HOSPITAL CORPORATION, Appellant, *vs.* SOUTHERN ILLINOIS HOSPITAL CORPORATION *et al.,* Appellees.

*Opinion filed May 19, 1961.*

JOHN L. STEWART, STEWART & STEWART, and WILLIAM M. WOLFF, all of Murphysboro, and MELVIN F. WINGERSKY, of Marion, for appellant.

GRENVILLE BEARDSLEY, Attorney General, of Springfield, (WILLIAM C. WINES, and THEODORE G. MAHERAS, Assistant Attorneys General, of counsel,) for appellee Attorney General; CHARLES E. FEIRICH, and FEIRICH & FEIRICH, both of Carbondale, for appellee Southern Illinois Hospital Corporation; CHARLES D. WINTER. WINTERS, POWLESS & MORGAN, and MELVIN F. WINGERSKY, all of Marion, for appellees the Southern Illinois Conference

W.S.C.S. of the Methodist Church *et al.;* and MEDLIN & ZIMMER, of Carbondale, (JAMES R. ZIMMER, of counsel,) for intervenors-appellees.

Mr. CHIEF JUSTICE SCHAEFER delivered the opinion of the court:

Holden Hospital Corporation (Holden) brought this action to secure approval of a contract to sell all of its assets and to obtain instructions as to the distribution of the proceeds of the sale. Both Holden and the vendee, Southern Illinois Hospital Corporation (Southern), are charitable corporations. The defendants were Southern, the Attorney General of Illinois, The Southern Illinois Conference of the Methodist Episcopal Church (Methodist Conference) and The Southern Illinois Conference Woman's Society of Christian Service (Woman's Society). Both the Attorney General and a group of intervenors who alleged themselves to be "adversely affected" by the proposed sale filed counterclaims. The trial court dismissed the complaint for want of equity and, in accord with the prayer of the counterclaims, ordered Holden to continue to operate its hospital. The court also retained jurisdiction of "this cause and all parties hereto" for an indefinite period of time. Holden, Southern, Methodist Conference and Woman's Society have appealed directly to this court. The contract contemplated the sale of Holden's real estate, and a freehold is involved. *McDonough County Orphanage* v. *Burnhart,* 5 Ill.2d 230, *Catholic Bishop of Chicago* v. *Murr,* 3 Ill.2d 107, *Altschuler* v. *Chicago City Bank and Trust Company,* 380 Ill. 137.

The controversy arose in the following factual context. In 1912 Carrie Holden donated her house in Litchfield, Illinois, to the Home Missionary Society of the Methodist Church. For some time the Society used it for a hospital, but when it subsequently appeared that it was impractical to maintain a hospital in Litchfield, the Society first leased,

and then bought, the former Amy Lewis hospital in Carbondale. The Society operated the hospital until 1925.

In that year, Holden Hospital Corporation was organized under the not-for-profit provisions of the Corporation Act of 1872. (Cahill's Ill. Rev. Stat. 1923, chap. 32, par. 159-164). Its charter stated its purposes in these terms: "The object for which it is formed is to own and maintain hospitals and equipment for the relief of the sick, needy and destitute, and conduct in connection therewith schools and homes for nurses; to maintain and conduct classes for first aid, education and relief, and maintain and conduct clinics and traveling instructors." Paragraph 5 of the charter stated that "The location is in the city of Carbondale" and gave the corporation's address.

At a meeting held at the First Methodist Episcopal Church on the day following incorporation, the conveyance of hospital property, including the old Amy Lewis building, from the Home Missionary Society was accepted and by-laws were adopted which provided that thirteen of the 27 members of the corporation were to be elected by the Home Missionary Society (the grantor), thirteen by the Methodist Conference and one by the board of trustees of the latter organization from its own members. In 1948 the bylaws were amended to provide that there should be 25 instead of 27 members, 12 to be elected from the Woman's Society, 12 from the Methodist Conference, as before, and the 25th to be the District Superintendent of the Methodist Conference.

The hospital was partially destroyed by fire in 1940. At that time, Holden launched a campaign to secure funds to rebuild and an appeal was made to the public. Part of the literature used in the campaign is in the record and although some of it indicates that the hospital is under religious supervision, it does not indicate the dominant role which the Methodist Church played in its operation. During the campaign, the hospital received $43,000. Although the rec-

ord is not clear as to just when such gifts were made, it is plain that a wide variety of organizations and individuals have contributed to Holden over the years. For example, gifts of more than $250 were made by the Episcopal Church, the Baptist Church, the Lions Club, the Modern Woodmen of America, the Rotary Club, the Elks Club, and numerous other organizations, companies, and individuals. Although the record is vague in many respects, it is certain that since its incorporation Holden has received strong financial support both from the Methodist Church and its affiliated organizations, and from individuals and secular organizations in Carbondale. It has also received many gifts from outside sources, such as a grant of $20,000 from the Ford Foundation in 1957. So far as appears from the record, however all gifts made to Holden, including the original grant from the Home Missionary Society, were made free of any restrictions or provisions for reverter.

The hospital was thus established by the Methodist Church in one of its various corporate forms, and has remained under its supervision. Its facilities, however, have always been open to everyone, regardless of religion, and, as noted above, it has received support from the community. Most of its 55 beds are constantly in use, and there is no dispute that it fills a need in the Carbondale area, in spite of the establishment and growth of other hospitals nearby.

Nevertheless, Holden has had financial difficulties. During 1956, it sustained an operating loss of more than $30,-000, and a net loss in its nonoperating accounts as well. The corporation thus entered 1957 with a working capital deficit even though it had borrowed $25,000 during the year to meet operating expenses. Dr. W. A. Robinson, a Methodist minister and former Holden board chairman, testified that by the end of 1956 the hospital had gone $60,000 in debt and expended $118,000 of its reserves. It had been unable to obtain credit from local tradesmen and at one point was unable to pay its bills.

The board concluded that $160,000 would be needed to put the hospital's finances in order again and it launched a fund raising drive with this amount as the goal. Dr. Robinson testified that only $95,000 was pledged or contributed, and that approximately $70,000 of this amount came from the Woman's Society. The entire amount contributed was returned to the donors, and the pledges were cancelled.

In 1957, the corporation decided to accept an offer by Southern Illinois Hospital Corporation to purchase all of its assets for $275,000. This offer provided that the buyer would pay $25,000 at the time of the sale, and that two notes, one for $75,000 at 5% and another for $175,000 at 1%, both secured by a mortgage, would be given by the vendee. The $75,000 note would be paid over a four-year period, and the other over a maximum period of 18 years. Both notes were subject to the condition that if the hospital should be closed "by any municipal, state or federal authority, or by the fire marshal," the buyer would be released from further liability and would reconvey the property to the seller. As to the $175,000 note, there was a condition that "if, in the sole judgment of Buyer, the operation of the hospital shall be economically unsuccessful," the obligation would cease and the property be reconveyed to the seller. The contract also provided: "Buyer agrees that after delivery of the deed and bill of sale and while any portion of the indebtedness to the Seller is unpaid it will not voluntarily close the hospital and will not intentionally or wilfully do or cause to be done any act which will result in such closing by any municipal, state or federal authority or by the fire marshal."

Holden's complaint asked that the court decree that the parties to the sale could lawfully carry out their contract. In 1948 Holden had adopted a bylaw stating that title to its property was held in trust for the use of the Woman's Society and the Methodist Conference, and the complaint asked that the court decree that the funds received from the

sale would be held upon the same trust, or, in the alternative, that the court decree that the funds be distributed "in accordance with a plan to be formulated by the Board of Directors of the plaintiff and submitted to this court for approval, or otherwise."

The Attorney General denied that the Methodist Conference and the Woman's Society had any interest, by virtue of the bylaw or otherwise, in Holden's assets or in the proceeds of the sale. It was his position that if the court should decide to authorize a sale for less than adequate consideration, it should also decree that Southern would hold the property subject to the terms of Holden's charter. He also asked, however, that the court order Holden to "continue its corporate existence and to carry out the purpose of said charitable trust * * *."

The decree found that Holden's charter did not authorize it to sell its property "so as to defeat the objectives and purposes for which it was formed" and that "it is neither impossible nor impracticable nor illegal for the plaintiff corporation to continue to operate as a charitable public trust * * *." It also found that the Woman's Society and the Methodist Conference had no interest in Holden's assets, that the offer for the purchase of those assets was "grossly inadequate," and that Holden's financial condition was "sound." It found that the directors of Holden had "abused their discretion" in attempting to sell its assets, and ordered that Holden should continue to operate the hospital, subject to the jurisdiction of the court.

On this appeal, the Attorney General urges that the court's decree was proper, laying special emphasis upon the court's finding that the sale price was inadequate and that it is not impractical for Holden to continue to operate. He also argues that the applicable statutes do not permit a sale "in breach of trust." In attacking the decree, Holden places its principal reliance upon the General Not-for-Profit Corporation Act, (Ill. Rev. Stat. 1959, chap. 32, pars. 163a-

163a100.) Pointing out that it has done no more than ask the court for instructions about a proposed course of action, it objects strongly to the court's characterization of the directors' conduct as an "abuse of discretion," and protests the court's decision to retain jurisdiction of the corporation's affairs.

We need not consider the intervenors' contentions. Although Holden made no objection in the trial court to the order which permitted intervention, in this court it suggests that the intervenors lack standing, and we are of the opinion that the suggestion is well taken. The allegation of the intervenors was that they had contributed funds to Holden Hospital Corporation and it does not appear from the record that there is any other ground upon which their standing to take part in this case might be predicated. The Appellate Court has taken the view that the interest of a donor to a trust or a member of the public concerned with its work is insufficient to give standing, (*Smith* v. *Thompson*, 266 Ill. App. 165; *People ex rel. Courtney* v. *Wilson*, 327 Ill. App. 231, *Art Institute of Chicago* v. *Castle*, 9 Ill. App. 2d 473,) although there is *dicta* to the contrary in *McGee* v. *Vandeventer*, 326 Ill. 425. We agree with the well supported view (Restatement of Trusts, Second, § 391; 2a Bogert on Trusts, secs. 414, 415) that the Attorney General is usually the proper party to represent the public's interest in the trust. That should be so here, we think. The intervenors claim no special interest in the corporation other than that arising from their unrestricted contributions made in the past.

We may begin consideration of the contentions by noting our accord with Holden's views in regard to the abuse of discretion. It is hard to see how, on any theory, the directors' discretion was so narrow as to forbid them to formulate a plan which might take effect only upon approval by a court. Nor does there appear to be any reason to retain jurisdiction of the corporation's affairs, no matter what

the outcome of the case. The directors have done nothing whatever that casts any doubt on their good faith. Recognizing the problems raised by their plan, they have sought judicial approval in order to avoid any danger of transgressing legal boundaries. It would be a strange reward for their caution if they are on that account to be deprived of control of their enterprise.

Some preliminary observations about the nature of Holden's plan are necessary. The plan does not mention dissolution, yet it looks in that direction. It is clear that Holden means to continue in existence only so that it may funnel the consideration from Southern to the distributees and repossess the hospital should that be required. The general effect of the plan is not to close down the hospital, for, subject to certain conditions which may take many years to fulfill, Southern binds itself by its agreement to operate the hospital. Nor is it to cause an abandonment of some particular charitable function to which the charter commits Holden, for the charter says only that the corporation's purpose is to operate "hospitals" and mentions Carbondale only to designate the location of the corporation's office. If the Attorney General's contention as to the adequacy of consideration is sound, the effect is not to remove from Carbondale and its local institutions a sum equal to the value of Holden's assets, for the hospital is being sold for less than it is worth. Rather, the effect is to transfer the management of the assets of Holden from one charitable corporation to another and to commit the transferee to make certain payments.

Holden's charter does not forbid the members and directors to embark upon this plan. It is completely silent as to everything sought to be done here, except that it declares the purpose of the corporation to be the operation of "hospitals," a very general objective. Abandonment of a particular hospital site is not in conflict with the conceptions of the incorporators. We are not dealing with trustees ap-

pointed pursuant to a testator's will. It is true that the Home
Missionary Society's conveyance was just as complete and
final as any other conveyance to charity and that the charter
is the measure of the disposition which it made. But that
is not to say that all of the steps proposed here are forbidden.

It is not seriously disputed that the General Not-for-
Profit Corporation Act is controlling. We have already ob-
served that although technically only a sale is in question
here, dissolution is also contemplated. Section 5 of the Gen-
eral Act provides that "Each corporation shall have power:
* * * (e) to sell * * * all or any part of its property
and assets. * * * (1) To make donations in furtherance
of any of its purposes * * * (m) To cease its corporate
activities and surrender its corporate franchise." Section
43 provides that "A sale * * * of all, or substantially
all, the property and assets of a corporation may be made"
upon a vote of the board of directors and two-thirds of the
members. Section 44 gives authority upon the same terms
to the board and the members voluntarily to dissolve the
corporation. Ill. Rev. Stat. 1959, chap. 32, pars. 163a4,
163a42 and 163a43.

This language, taken literally, is broad enough to author-
ize the proposed action, and we do not encounter any con-
flicting policies in finding that the members have power to
embark on this course. Holden is permitted to make dona-
tions in furtherance of its purposes. Southern is a charity
with purposes very similar to those of Holden. That factor
alone deprives the Attorney General's argument about in-
adequate consideration of much of its force. Furthermore,
Southern would be a proper distributee under the standards
of section 45(c) of the General Act, the effect of which is
discussed below.

The suggestion of the trial court that dissolution and
sale are improper because the purposes of the corporation
can still be carried out is based upon the doctrine of judicial
*cy pres*, which we think is not controlling, and it fails to

take into account the statute that governs here. That doctrine rests upon the conviction that the donor's intent should be law unless it is impossible, impracticable, or illegal that it should be so. It contemplates that the court will decree that property which can no longer be applied to a specific purpose selected by the donor, will be applied instead to some different purpose, as near as may be to the one which he selected, within the scope of his general charitable intent. Here there is no specific purpose that can not be carried out, and the doctrine is not applicable. There is nothing to prevent this property from being used for the operation of hospitals. Indeed, the property must remain devoted to those ends. *Cy pres* is only of importance when there is a need to divert property from one purpose to another; here, the statutory scheme permits the property to remain devoted to the basic purposes that were set forth in Holden's charter. It should be of little consequence to anyone that Holden's assets are administered in the future not by Holden but by some other corporation under similar restrictions. We do not face the problem of violating the intent of the grantor.

We come now to the question of distribution of the proceeds of sale and the validity of Holden's bylaw which purported to establish a "trust" for the Methodist Conference and the Woman's Society. The bylaw expresses a relationship which finds support in a statute (not repealed by the General Act) enacted in 1903, (Ill. Rev. Stat. 1959, chap. 32, par. 201,) which provides that when the purposes of a charitable corporation can no longer be carried out, it may be dissolved and the assets distributed to the religious denomination having "care or patronage" of the corporation. Since Holden's purposes are so general as to be easily carried out, we can give this statute no effect here.

The General Act establishes other standards to deal with situations in which the purposes remain capable of fulfillment, which are the same regardless of whether the corporation is carrying out its dissolution without aid of a court or

has made "application * * * to have its dissolution continued under the supervision of the court." (Ill. Rev. Stat. 1959, chap. 32, par. 163a53(c).) Sections 45(c) and 55(c) of the General Act provide that "Assets held for a charitable * * * use * * * shall be transferred or conveyed to one or more domestic or foreign corporations, societies or organizations engaged in activities substantially similar" to those of the dissolving corporation. In short, the statute sets up specific standards to be applied in determining the disposition of assets. of dissolving charitable corporations. There is no provision for evading this standard by means of a bylaw. The more general provisions in the statute, such as section 45(d) (par. 163a44d) which says that "other assets" may be distributed in accordance with the bylaws, are not applicable here, for all of Holden's assets are held for a charitable use. Many kinds of corporations are involved, and some of the provisions of the General Act are of necessity very broad. They should not be read to destroy specific limitations imposed for a limited class of corporations elsewhere in the act. We do not believe that the statute is intended to authorize the directors to enact bylaws which will remove the restrictions on their own authority imposed by section 45c.

Holden has, in its complaint, sought approval of a course of action which explicitly involves sale and distribution of the proceeds and implicitly involves dissolution. We see no legal impediment to sale and dissolution. However, we cannot rule on the question of distribution except as we have rejected the bylaw. There is no evidence in the record to show that the proposed distributees are carrying on "substantially similar" activities. Furthermore, Holden's complaint can hardly be deemed an "application to have its dissolution continued under supervision of the court." Only in that circumstance is the court given full power to apply the "substantially similar" standard. (Ill. Rev. Stat. 1959, chap. 32, pars. 163a54, 163a55.) Otherwise, the assets are

to be distributed in accordance with a plan of distribution, subject to that standard, adopted by the members and directors. Ill. Rev. Stat. 1959, chap. 32, pars. 163a44(c), 163a45.

Therefore, we hold no more than that sale and dissolution are permitted. Holden is free to distribute the proceeds of the sale to the Methodist Conference or the Woman's Society only if one or both of them meet the statutory standard. The decree is reversed and the cause is remanded with directions to the trial court to enter judgment in accordance with this opinion.

*Reversed and remanded, with directions.*