[L. A. No. 26995.   In Bank.   Aug. 31, 1964.]

J. FRANK HOLT et al., Plaintiffs and Appellants, v. COLLEGE OF OSTEOPATHIC PHYSICIANS AND SURGEONS et al., Defendants and Respondents.

Mitchell, Silberberg & Knupp, Arthur Groman and Howard S. Smith for Plaintiffs and Appellants.

Stanley Mosk, Attorney General, Carl Boronkay, Deputy Attorney General, Belcher, Henzie & Biegenzahn, Belcher, Henzie & Fargo, George M. Henzie and Seth M. Hufstedler for Defendants and Respondents.

TRAYNOR, J.—Plaintiffs appeal from a judgment of dismissal entered after the sustaining of a demurrer to their complaint without leave to amend in an action to enjoin the breach of a charitable trust and for declaratory relief.

Plaintiffs are three trustees of defendant College of Osteopathic Physicians and Surgeons (hereinafter COPS), a California charitable corporation. The other defendants are the 23 remaining trustees on the COPS board of trustees and the Attorney General. The complaint alleges in substance that COPS holds assets in excess of $1,500,000 in trust for charitable purposes, and that defendant trustees have acted contrary to these purposes and threaten other such acts. By their first cause of action plaintiffs seek to enjoin these acts, and by their second cause of action they seek a declaration of their and defendants' rights and duties with regard to the operation of COPS.

The Attorney General filed an answer to the complaint denying for want of information and belief the allegations that defendant trustees were diverting the assets of COPS from its charitable purposes. As an affirmative defense the Attorney General stated that "The matter of proposed changes in the operation of said College was reviewed by the Attorney General to determine whether such changes would constitute a violation of a charitable trust warranting institution of a suit by this office to remedy the situation. It has been concluded that the changes to be made in the operation of said College would not be detrimental to the public interest and do not warrant legal action by this office to prevent such changes." The Attorney General also stated that he had not granted "relator status" to plaintiffs and had not consented to their bringing this action. Defendant trustees demurred to the complaint and the trial court sustained the demurrer on the grounds that plaintiffs have no capacity to bring this action and that the complaint does not state facts showing a threatened breach of a charitable trust.

The first issue is whether plaintiffs, as minority trustees of a charitable corporation, can sue the majority trustees to enjoin their allegedly wrongful diversion of corporate assets

in breach of a trust for charitable purposes. Defendants contend that only the Attorney General can bring such an action.

The prevailing view of other jurisdictions is that the Attorney General does not have exclusive power to enforce a charitable trust and that a trustee or other person having a sufficient special interest may also bring an action for this purpose.[1] This position is adopted by the American Law Institute (Rest. 2d Trusts, § 391) and is supported by many legal scholars. (Karst, *The Efficiency of the Charitable Dollar: An Unfulfilled State Responsibility*, 73 Harv.L.Rev. 433, 443-449; 4 Scott, Trusts (2d ed.) § 391; 4 Pomeroy, Equity (5th ed.) 287, n. 13; see also Note 62 A.L.R. 881; 4 Witkin, Summary of Cal. Law (7th ed.) 2918-2919.)

In accord with the majority view, this court has stated that ". . . the only person who can object to the disposition of the trust property is one having some definite interest in the property—he must be a trustee, or a *cestui*, or have some reversionary interest in the trust property." (*O'Hara* v. *Grand Lodge I.O.G.T.*, 213 Cal. 131, 140 [2 P.2d 21]; see also *People* v. *Cogswell*, 113 Cal. 129, 136 [48 P. 270, 35 L.R.A. 269]; *Pratt* v. *Security Trust & Sav. Bank*, 15 Cal.App.2d 630, 640-641 [59 P.2d 862]; cf. *St. James Church* v. *Superior Court*, 135 Cal.App.2d 352, 360 [287 P.2d 387].)

Defendants invoke Corporations Code sections 9505 and 10207 for the proposition that only the Attorney General can bring an action for the enforcement of a charitable trust administered by either a nonprofit or charitable cor-

---

[1] (*Duffee* v. *Jones*, 208 Ga. 639 [68 S.E.2d 699, 703]; *Jenkins* v. *Berry*, 119 Ky. 350 [83 S.W. 594, 597]; *Sister Elizabeth Kenny Foundation* v. *National Foundation*, 267 Minn. 352 [126 N.W.2d 640, 646]; *Dickey* v. *Volker*, 321 Mo. 235 [11 S.W.2d 278, 281, 62 A.L.R. 858]; Souhegan *Nat. Bank* v. *Kenison*, 92 N.H. 117 [26 A.2d 26, 30]; *DiCristofaro* v. *Laurel Grove Memorial Park*, 43 N.J. Super. 244 [128 A.2d 281, 284]; *Trustees of Sailors' Snug Harbor* v. *Carmody*, 158 App.Div. 738 [144 N.Y.S. 24, 37], affd. 211 N.Y. 286 [105 N.E. 543, 546]; *Shields* v. *Harris*, 190 N.C. 520 [130 S.E. 189, 192]; *Agan* v. *United States Nat. Bank*, 227 Ore. 619 [363 P.2d 765, 769]; *Wiegand* v. *Barnes Foundations*, 374 Pa. 149 [97 A.2d 81, 82-83]; *Clevenger* v. *Rio Farms* (Tex.Civ.App.) 204 S.W. 2d 40, 45-46; *Clark* v. *Oliver*, 91 Va. 421 [22 S.E. 175, 176]; *Nash* v. *Morley*, 49 Eng. Reprint 545, 547-548; see also *Thurlow* v. *Berry*, 247 Ala. 631 [25 So.2d 726, 733]; *Cannon* v. *Stephens*, 18 Del. Ch. 276 [159 A. 234, 236-237]; *Holden Hospital Corp.* v. *Southern Ill. Hospital Corp.*, 22 Ill. 2d 150 [174 N.E.2d 793, 796]; *Gilbert* v. *McLeod Infirmary*, 219 S.C. 174 [64 S.E.2d 524, 528, 24 A.L.R.2d 60]; *Bellows Free Academy* v. *Sowles*, 76 Vt. 412 [57 A. 996, 999].)

poration. These sections provide that if there is a failure to comply with a charitable trust ". . . the Attorney General shall institute, in the name of the State, the proceedings necessary to correct the noncompliance or departure." Nothing in these sections suggests that trustees are precluded from bringing an action to enforce the trust. The Uniform Supervision of Trustees for Charitable Purposes Act (Gov. Code, §§ 12580-12595) similarly authorizes the Attorney General to supervise charitable trusts, and likewise fails to preclude suits by trustees.

The foregoing statutes were enacted in recognition of the problem of providing adequate supervision and enforcement of charitable trusts.[2] Beneficiaries of a charitable trust, unlike beneficiaries of a private trust, are ordinarily indefinite and therefore unable to enforce the trust in their own behalf. (E.g., *People v. Cogswell*, 113 Cal. 129, 136-137 [45 P. 270, 35 L.R.A. 269]; *Pratt v. Security Trust & Sav. Bank*, 15 Cal.App.2d 630, 639-641 [59 P.2d 862].) Since there is usually no one willing to assume the burdens of a legal action, or who could properly represent the interests of the trust or the public, the Attorney General has been empowered to oversee charities as the representative of the public, a practice having its origin in the early common law. (See generally Scott, *supra*, § 391, pp. 2753-2756.)

In addition to the general public interest, however, there is the interest of donors who have directed that their contributions be used for certain charitable purposes. Although the public in general may benefit from any number of charitable purposes, charitable contributions must be used only for the purposes for which they were received in trust. (*O'Hara v. Grand Lodge I.O.G.T.*, *supra*, 213 Cal. at pp. 140-141; *Pacific Home v. County of Los Angeles*, 41 Cal.2d 844, 854 [264 P.2d 539]; see also *Estate of Faulkner*, 128 Cal. App.2d 575, 578 [275 P.2d 818].) Moreover, part of the problem of enforcement is to bring to light conduct detrimental to a charitable trust so that remedial action may be

---

[2]This problem has been extensively discussed in recent years. (See Karst, *The Efficiency of the Charitable Dollar: An Unfulfilled State Responsibility*, 73 Harv.L.Rev. 433; Bogert, *Proposed Legislation Regarding State Supervision of Charities*, 52 Mich.L.Rev. 633; Bogert, *Recent Developments Regarding the Law of Charitable Donations and Charitable Trusts*, 21 U.Chi.L.Rev. 118; Note, *State Supervision of the Administration of Charitable Trusts*, 47 Colum.L.Rev. 659; Note, *The Charitable Corporation*, 64 Harv.L.Rev. 1168.)

taken. The Attorney General may not be in a position to become aware of wrongful conduct or to be sufficiently familiar with the situation to appreciate its impact, and the various responsibilities of his office may also tend to make it burdensome for him to institute legal actions except in situations of serious public detriment. (See Karst, *supra,* 73 Harv.L.Rev. at pp. 478-479; Bogert, *Proposed Legislation Regarding State Supervision of Charities,* 52 Mich.L.Rev. 633, 634-636; Scott, *supra,* § 391, pp. 2754-2756.)

The present case illustrates these difficulties. ■ The pleading filed by the Attorney General stated that he had no information or belief as to the plaintiffs' allegations that trust assets were being diverted from their charitable purpose. Yet the pleading also stated that the Attorney General determined that legal action by his office was not warranted because the changes in the operation of COPS "would not be detrimental to the public interest. . . ." The test applied by the Attorney General in deciding not to take legal action is clearly incorrect, for the assets of COPS as a charitable institution can be used only for the purposes for which they were received in trust. The trust is not fulfilled merely by applying the assets in the public interest.[3]

■ Although the Attorney General has primary responsibility for the enforcement of charitable trusts, the need for adequate enforcement is not wholly fulfilled by the authority given him. The protection of charities from harassing litigation does not require that only the Attorney General be permitted to bring legal actions in their behalf. This consideration ". . . is quite inapplicable to enforcement by the fiduciaries who are both few in number and charged with the duty of managing the charity's affairs." (Karst, *supra,* 73 Harv.L.Rev. at pp. 444-445.) There is no rule or policy against supplementing the Attorney General's power of enforcement by allowing other responsible individuals to sue in behalf of the charity.[4] The administration of charitable

[3]We are not presented with the applicability of the cy-pres doctrine, which permits change of charitable purposes under some circumstances. (See, e.g., *Estate of Loring,* 29 Cal.2d 423, 436 [175 P.2d 524]; *O'Hara v. Grand Lodge I.O.G.T., supra,* 213 Cal. at pp. 140-141.)

[4]Defendant trustees' reference to the safeguards afforded in the area of private corporations (Corp. Code, § 834) is inapplicable, since trustees as fiduciaries have a special interest wholly unlike that of a private corporate shareholder. We do not reach the question whether minority directors of a private corporation can bring an action in behalf of the

trusts stands only to benefit if in addition to the Attorney General other suitable means of enforcement are available. "The charity's own representative has at least as much interest in preserving the charitable funds as does the Attorney General who represents the general public. The cotrustee is also in the best position to learn about breaches of trust and to bring the relevant facts to a court's attention." (Karst, *supra,* 73 Harv.L.Rev. at p. 444.) ▪ Moreover, permitting suits by trustees does not usurp the responsibility of the Attorney General, since he would be a necessary party to such litigation and would represent the public interest. (See *In re Los Angeles County Pioneer Society,* 40 Cal.2d 852, 861 [257 P.2d 1].)

Defendant trustees urge that a distinction should be made between trustees of a charitable trust and the governing board of a charitable corporation. They apparently concede that a minority trustee of a charitable trust has the capacity to sue, but contend that members of a governing board of a charitable corporation are not truly trustees and that a different rule applies to them. The Attorney General takes the position that he is the only one empowered to bring suit in either situation. Corporations Code section 10205 states that the powers of a charitable corporation shall be vested in a "board of trustees." Defendant trustees contend, however, that this title does not disclose their true status, that it is the corporation as a legal entity that is properly designated the trustee of the assets held in trust for charitable purposes, and that the members of the board are merely employees of the corporate trustee.

It is true that trustees of a charitable corporation do not have all the attributes of a trustee of a charitable trust. They do not hold legal title to corporate property (see Corp. Code, § 10206, subd. (d)) and they are not individually liable for corporate liabilities (Corp. Code, § 9504). The individual trustees in either case, however, are the ones solely responsible for administering the trust assets (Corp. Code, § 10205), and in both cases they are fiduciaries in performing their trust duties. (*St. James Church* v. *Superior Court,* 135 Cal.App.2d 352, 361 [287 P.2d 387].) Rules governing charitable trusts ordinarily apply to charitable corporations. (Karst, *supra,*

corporation. (Cf. *Sealand Inv. Corp.* v. *Emprise, Inc.,* 190 Cal.App.2d 305 [12 Cal.Rptr. 153].) The differences between private and charitable corporations make the consideration of such an analogy valueless.

73 Harv.L.Rev. at pp. 435-436; Rest.2d Trusts, *supra,* § 348, p. 212; Scott, *supra,* § 348.1, p. 2559; Comment, *Trusts—Gifts to Charitable Corporations,* 26 So.Cal.L.Rev. 80, 85.) There is no sound reason why minority directors or "trustees" of a charitable corporation cannot maintain an action against majority trustees when minority trustees of a charitable trust are so empowered.

The rules governing private trusts also support plaintiffs' position with respect to the enforcement of a charitable trust. It is settled that one trustee of a private trust may sue a co-trustee to enjoin conduct by him that violates the trust, notwithstanding the right of the beneficiaries to bring an action in their own behalf. (E.g., *Estate of Hensel,* 144 Cal.App.2d 429, 438 [301 P.2d 105]; *Stanton* v. *Preis,* 138 Cal.App.2d 104, 106 [291 P.2d 118]; Rest. 2d Trusts, *supra,* § 200, comment e.) It follows *a fortiori* that a charitable trust should be enforceable by one or more of its trustees, since its indefinite class of beneficiaries is ordinarily not able to protect its own interest by legal action.[5]

Plaintiff trustees therefore have the capacity to bring an action in behalf of COPS against the majority trustees to enjoin any breach of trust that is threatened. To the extent it is contrary to this opinion, *George Pepperdine Foundation* v. *Pepperdine,* 126 Cal.App.2d 154 [271 P.2d 600], is disapproved.

The question remains whether the complaint states a cause of action. A summary of the complaint follows. The articles of incorporation of COPS state its charitable purposes to be:

"To establish, maintain, carry on and conduct an osteopathic medical and surgical college, in which all branches of learning, and instruction which now pertain or which may in the future pertain to the science and art of health maintenance; prevention, relief and recovery from disease, as well as any or all academic subjects desirable or necessary as a foundation for the teaching of such branches." [*sic*]

Osteopathic medicine, unlike allopathic medicine, places

---

[5] *St. James Church* v. *Superior Court, supra,* 135 Cal.App.2d 352, 360, relied on this rule in upholding an action brought by a majority of trustees of a charitable religious corporation against one of the trustees to enjoin his breach of trust. The court quoted section 200, comment e, of the Restatement Second of Trusts, *supra,* for the rule that "If there are several trustees, one or more of them can maintain a suit against another to compel him to perform his duties under the trust, or to enjoin him from committing a breach of trust. . . ."

special emphasis on the "functions and importance of the dysfunctions of the musculoskeletal system of the human body," on the "intimate interrelationship and natural curative resources of the human body viewed as a whole," and on the "value of manipulative therapy for conditions and ailments of the human body." Students in an osteopathic school receive a special and unique education and training in the principles of osteopathic medicine not taught at medical schools teaching the allopathic theory of medicine. Physicians trained at osteopathic schools are known as osteopathic physicians and surgeons, or as osteopaths, and constitute a separate and distinct profession practicing the diagnosis and treatment of all human ailments. An osteopath receives an unlimited physician's and surgeon's license that grants him rights and privileges identical with those granted by the license issued to a graduate of an allopathic medical school. Osteopathy is a growing profession in the United States and is generally accepted and recognized as a distinct and separate school and theory of medicine.

At all times since its incorporation in 1914 until about May 24, 1961, COPS continuously conducted an osteopathic medical and surgical college that trained young men and women in osteopathic medicine. Other activities of COPS include staffing, teaching, and assisting in the operation of the Los Angeles Osteopathic Hospital, a division of the Los Angeles County Hospital; carrying on research in osteopathic medicine; conducting a general clinic providing osteopathic medical and surgical care; and operating a postgraduate school in osteopathic medicine and surgery. During this period the trustees of COPS have held out to the public and members of the osteopathic profession that COPS was an osteopathic medical college dedicated to providing training in osteopathic medicine. On the basis of such representations, COPS has solicited and received donations for use in teaching, research, and the general promotion of osteopathy. COPS also has actively solicited and received scholarship funds and research grants from the American Osteopathic Associations, a national organization dedicated to the furtherance of osteopathic medicine and surgery in the United States.

Plaintiffs allege that defendant trustees threaten to divert the assets of COPS to purposes other than those for which it was organized and for which COPS has in the past solicited and received funds in trust. The particular acts complained of

are (1) on May 24, 1961, defendant trustees resolved that COPS shall perform certain acts contemplated in an agreement between the California Medical Association and the California Osteopathic Association, including changing the name of COPS so that neither the word "osteopathic" or any similar word shall be used, and using its best efforts to obtain approval by the Council on Medical Education and Hospitals of the American Medical Association and to obtain membership in the Association of American Medical Colleges; (2) on June 5, 1961, defendant trustees resolved to apply for membership for COPS in the Association of American Medical Colleges, and to apply for approval of COPS by the Council on Medical Education and Hospitals of the American Medical Association; (3) COPS has, on the direction of defendant trustees, applied to the Association of American Medical Colleges for approval as an allopathic medical school, and has applied to the Council on Medical Education and Hospitals of the American Medical Association to become an approved allopathic medical school; (4) on June 5, 1961, defendant trustees resolved to amend the articles of incorporation of COPS to change its name to "California College of Medicine," and COPS has since filed an amendment with the Secretary of State so changing its name; (5) on November 8, 1961, defendant trustees approved an agreement between COPS and the California Osteopathic Association in which COPS agreed to perform various of the acts already recited and also "to assist in the removal of the distinction among any persons practicing medicine in the State of California holding an unlimited Physician and Surgeon's certificate."

Plaintiffs contend that the foregoing acts have the purpose and effect of abandoning and repudiating the charitable purpose of COPS to conduct an osteopathic medical and surgical college and to convert COPS into a school teaching nonosteopathic medicine and surgery according to the allopathic school of medicine.

We have concluded that the complaint states a cause of action for enjoining a threatened breach of a charitable trust. If the allegations of the complaint are true, the charitable purpose of COPS is primarily to conduct a college of osteopathy for the training of osteopathic physicians and surgeons and for the general furtherance of the profession of osteopathy. The complaint sufficiently alleges a distinction between osteopathic and allopathic medicine. Consequently,

the change of COPS' curriculum or the taking of other steps for the purpose of gaining accreditation as an allopathic medical college, and the training of allopathic physicians and surgeons, are sufficiently alleged to be acts not within the purpose of conducting an osteopathic college.

Defendant trustees contend that the differences between the two branches of medicine are insignificant and that the removal of any distinction between these branches would not change the teaching of osteopathy from that previously practiced at COPS. These contentions, however, do not go to the sufficiency of the complaint, but only raise issues of the truth of the allegations of the complaint.

Defendant trustees also point out that the articles of COPS provide that it shall establish a college "in which shall be taught all branches of learning, and instruction which now pertain or which may in the future pertain to the science and art of health maintenance. . . ." This provision justifies the teaching of subjects in allopathic medicine at COPS, and in fact the complaint alleges that COPS provides "training and education equal in scope and subject matter in all respects to the training received by students in medical schools teaching the allopathic school and theory of medicine." The purpose of COPS nevertheless is to conduct an *osteopathic* college, and, if the allegations of the complaint are true, the teaching of allopathic medicine is proper only insofar as is useful in the training of osteopaths. It is alleged that osteopathic schools place special emphasis on osteopathic theories and practices not emphasized in schools of allopathic medicine. According to the complaint, the training of osteopaths depends on the emphasis given to various subjects, even though courses may be given in allopathic medicine. Whether the teaching of allopathic medicine as threatened by defendant trustees will change the teaching emphasis at COPS contrary to the charitable purpose of conducting an osteopathic college presents a question of fact that cannot be decided on demurrer.

■ The complaint also states a cause of action for declaratory relief. Plaintiffs have alleged that a controversy exists between them and defendant trustees over their rights and duties as trustees of COPS. Plaintiffs are entitled to a judicial declaration of the charitable purposes of the COPS trust and whether certain conduct by COPS trustees would be contrary to these purposes and therefore a breach of trust.

■ The trial court correctly held that the California Osteopathic Association (hereinafter COA) is an indispen-

sable party to this action. Since plaintiffs seek to enjoin the performance by COPS of a contract between COPS and COA, the effect of a decree in favor of plaintiffs would be to enjoin COA as well as COPS. COA is therefore an indispensable party. (*Miracle Adhesives Corp.* v. *Peninsula Tile Contractors Assn.*, 157 Cal.App.2d 591, 593-594 [321 P.2d 482]; Code Civ. Proc., § 389.) Plaintiffs should be given leave to amend to join COA as a party defendant.

The judgment is reversed.

Gibson, C. J., Peters, J., Tobriner, J., and Peek, J., concurred.

McCOMB, J.—I dissent. In my opinion, this is the sole question necessary to determine: *Did the three minority trustees have the capacity to sue the corporation without the consent of the Attorney General?*

*No.* Only the Attorney General may bring an action to correct noncompliance with a trust assumed by a charitable corporation.

The affairs of either a private corporation or a charitable corporation are managed by a majority of the board of directors or board of trustees of the corporation (Corp. Code, §§ 800, 10205),[1] and the Corporations Code contains no provision to permit a minority of the directors or trustees, as such, to question action taken by the majority.[2]

---

[1] Section 800 of the Corporations Code provides: "Subject to limitations of the articles and of this division as to action which shall be authorized or approved by the shareholders, all corporate powers shall be exercised by or under authority of, and the business and affairs of every corporation shall be controlled by, a board of not less than three directors."

Section 10205 of the Corporations Code provides: "Subject to the provisions of the articles of incorporation [of a charitable corporation], the exercise of the powers of the corporation, with the right to delegate to officers and agents the performance of duties and the exercise of powers, shall be vested in a board of trustees."

Under section 10201 of the Corporations Code, a charitable corporation is required to have not less than 9, nor more than 25, trustees.

[2] Unlike California, New York specifically permits a director or officer of a corporation, as such, to institute and maintain a suit questioning action taken by one or more of the other directors or officers thereof. (N.Y. Gen. Corp. Law, §§ 60, 61; see *Tenney* v. *Rosenthal*, 6 N.Y.2d 204 [189 N.Y.S.2d 158, 160 N.E.2d 463, 467].) Without such statutory authorization, an action by an individual director would violate the

If a private corporation engages in unauthorized business, either a shareholder of the corporation or the State may enjoin the doing or continuation of such business by the corporation. (Corp. Code, § 803.)[3]

Where a charitable corporation has failed to comply with any trust which it has assumed, or where such a corporation has departed from the general purpose for which it was formed, the Attorney General is required to institute the proceedings necessary to correct the noncompliance or departure. (Corp. Code, § 10207.)[4] No provision has been made for such a right to be exercised by any other person.

The provisions of the General Corporation Law (Corp. Code, §§ 1-8999) are made applicable to corporations formed under the General Nonprofit Corporation Law (Corp. Code, §§ 9000-10703) except as to matters specifically otherwise provided for (Corp. Code, § 9002). However, the matter of who is entitled to bring an action for ultra vires acts of the officers or directors of a charitable corporation is "specifically otherwise provided for" by section 10207 of the Corporations Code. Therefore, no action may be filed under section 803 of the Corporations Code with respect to a charitable corporation.

In any event, however, although "shareholder" is defined to include a member of a nonstock corporation (Corp. Code,

---

requirement that the affairs of the corporation be managed by the board. (See Goldman and Kwestel, *Director's Statutory Action in New York* (1961) 36 N.Y.U.L.Rev. 199, 202.)

[3]Section 803 of the Corporations Code provides: "The statement in the articles of the objects, purposes, powers, and authorized business of the corporation constitutes, as between the corporation and its directors, officers, or shareholders, an authorization to the directors and a limitation upon the actual authority of the representatives of the corporation. Such limitations may be asserted in a proceeding by a shareholder or the State, to enjoin the doing or continuation of unauthorized business by the corporation or its officers, or both, in cases where third parties have not acquired rights thereby, or to dissolve the corporation, or in a proceeding by the corporation or by the shareholders suing in a representative suit, against the officers or directors of the corporation for violation of their authority . . . ."

[4]Section 10207 of the Corporations Code provides: "Each such corporation [charitable corporation] shall be subject at all times to examination by the Attorney General, on behalf of the State, to ascertain the condition of its affairs and to what extent, if at all, it may fail to comply with trusts which it has assumed or may depart from the general purpose for which it is formed. In case of any such failure or departure the Attorney General shall institute, in the name of the State, the proceedings necessary to correct the noncompliance or departure. . . ." (See also Corp. Code, § 9505.)

§ 103), no showing has been made that plaintiffs are members of defendant college.[5]

Accordingly, plaintiffs lacked capacity to bring the present action.[6]

I am of the opinion that we should not disapprove the holding in *George Pepperdine Foundation* v. *Pepperdine*, 126 Cal.App.2d 154 [271 P.2d 600], in which this court unanimously denied a hearing.

That case was decided in 1954 and has, presumably, been the law for 10 years. There is no way of telling how many citizens have followed the law as stated in that case or how many trial courts have rendered judgments relying thereon.

The Legislature has met on numerous occasions and has not seen fit to overrule the decision or to change the law as set forth therein. It could have done so very simply by amending

---

[5]"Member" includes each person signing the articles of a nonstock corporation and each person admitted to membership therein (Corp. Code, § 104), and under certain circumstances the persons on the controlling board of a nonprofit corporation are regarded as members (Corp. Code, § 9603).

[6]Although plaintiffs and the individual defendants are designated "trustees," they are not trustees in the strict sense, since the title to the property of the corporation is in the corporation and not in them. (*Bainbridge* v. *Stoner*, 16 Cal.2d 423, 428 [2, 3] [106 P.2d 423]; *Brown* v. *Memorial Nat. Home Foundation*, 162 Cal.App.2d 513, 540 [23] et seq. [329 P.2d 118, 75 A.L.R.2d 427] [hearing denied by the Supreme Court]; see Rest.2d Trusts (1959) § 16 A, com. a, p. 52.)

Whether or not plaintiffs could maintain this action if they and the individual defendants were trustees of a charitable trust, rather than members of the controlling board of a charitable corporation, is a question not now before us. There is, however, substantial authority to the effect that one of several trustees of a charitable trust may maintain an action against the others to enforce the trust or to compel the redress of a breach of trust. (See Rest.2d Trusts (1959) § 391, p. 278; 4 Scott, Trusts (2d ed. 1956) § 391, p. 2757. Cf. *O'Hara* v. *Grand Lodge I.O.G.T.*, 213 Cal. 131, 140 [4] [2 P.2d 21].)

In *George Pepperdine Foundation* v. *Pepperdine*, 126 Cal.App.2d 154, 161 [3] [271 P.2d 600], an action by a charitable corporation against its former directors for damages resulting from "dissipation of its assets through illegal and speculative transactions and mismanagement of its affairs" by the defendants during their incumbencies, the District Court of Appeal held that the Attorney General was the only person qualified to maintain an action on behalf of a benevolent, public, charitable trust whose beneficiaries were of an indefinite class of persons, and that the plaintiff therefore lacked capacity to bring the action. Although the language used by the District Court of Appeal refers to charitable trusts, and not to charitable corporations, the plaintiff there involved was, in fact, a charitable corporation.

section 10207 of the Corporations Code, which at that time vested, and now vests, in the Attorney General the sole authority to bring an action to correct noncompliance with a trust assumed by a charitable corporation.

In my opinion, in the absence of a showing that a prior decision was rendered through (1) corruption or (2) an obvious mistake, or (3) that conditions have changed making it inapplicable, the doctrine of stare decisis should be followed by this court so that the District Courts of Appeal, the trial courts, and lawyers may know what the established law is. Thus, trial courts will be in a position to render uniform decisions on similar facts, and lawyers will be able to advise their clients as to the course they should follow. (See *People* v. *Hines, ante,* pp. 164, 182 et seq. [37 Cal.Rptr. 622, 390 P.2d 398].)

My views on this subject are well expressed by the Honorable Paul R. Hutchinson, President of the Los Angeles County Bar Association, as follows:

"History records that when tyrants take over governments the first thing they do is suspend the judicial processes or, worse, select judges to do their bidding without regard for established law.

"Uncivilized governments of history were corrupt because their courts were not dependable. Justice was subject to the whim of the court. The law was whatever the *Court* said was the law. There was no stability—there was no assurance that the law on which men relied would still be the law when their rights reached the courts for adjudication.

"The common law set out to end this fickle, unreliable, unstable, capricious and sometimes corrupt system by adopting a system that called for adherence to established law. *Stare decisis,* we called it, which Bouvier defines as meaning, 'To abide by, or adhere to decided cases. It is a general maxim that when a point of law has been settled by decision, it forms a precedent which is not afterwards to be departed from. . . . Where there have been a series of decisions by the supreme judicial tribunal of a state, the rule of *stare decisis* may usually be regarded as impregnable, except by legislative act.'

"This doctrine was the crowning glory of the common law and of American jurisprudence. By it we became a government of laws, and not of men. 'The law' was the established law of the people. They provided the soundest basis for de-

termining the law by which they chose to be governed. If they thought a law was bad they could change it. But until they did so, the judge enforced it. He could not arrogate to himself the right to change the law and substitute his opinion for the established law of the people.

"We prospered under this rule, while less stable governments floundered all around us. Not in any country, at any time or era, was so much even-handed justice dispensed to the people. We were the envy of other people in other lands. They beat upon our gates for admission to our country like waves upon a dike. They came here by the millions. For they knew that, in spite of faults, that sometimes appeared, the system was so much bigger than the faults, that through it we had made one of the great contributions to man's eternal effort to establish justice among all men.

"Granted that the law should never be wholly inflexible; granted that changing conditions call for changing interpretations to prevent injustices stemming from an adherence to form that is so slavish it is blind to the heart and soul of the legal principle being ruled on, these exceptions should never justify a court re-writing the organic laws people have ordained for themselves without great and compelling reasons that find substantial support among the thinking people of the Country. . . ." (39 Los Angeles Bar Bulletin (July 1964) 321-322.)

". . . I cannot but conclude that there is a strong feeling arising among thinking lawyers that it is time to speak out to restore our fundamental system of checks and balances in government, which concept was one of the greatest contributions our Constitution made to organized governments throughout the world.

"Under this system the court construes the laws of the people. In construing them, it should not make new and fundamental laws not arising by fair implication from the laws at hand, for if it does it usurps the law-making power of the people and their legislative representatives.

"It is no valid answer that a majority of the justices think that the law they make is good law. We are not, under the Constitution, nor can we permit ourselves to become by construction or by default, a government by a shifting majority of the members of the Supreme Court.

"Nor should the Court's impatience to achieve reforms justify its refusal to apply established law. Roscoe Pound

was perhaps America's greatest jurist. His death this month prompts me to quote from his masterful address on 'The Causes of Popular Dissatisfaction with the Administration of Justice.' It has been re-published by the American Judiciary Society. Because basic truths never change, it comes as a surprise to learn that the remarks so apt were delivered in 1906. He said:

" 'Public opinion must affect the administration of justice through the rules by which justice is administered rather than through the direct administration. All interference with the uniform and automatic applications of these rules, when actual controversies arise, induces an anti-legal element which becomes intolerable. . . . We must pay a price for certainty and uniformity.' " (39 Los Angeles Bar Bulletin (Aug. 1964) 379-380.)

I would affirm the judgment.

The petition of respondent College and respondent trustees for a rehearing was denied September 24, 1964. Mosk, J., did not participate therein. McComb, J., was of the opinion that the petition should be granted.