# IN THE SUPREME COURT OF CALIFORNIA

DEBRA TURNER,
Plaintiff and Appellant,

v.

LAURIE VICTORIA et al.,
Defendants and Respondents.

S271054

Fourth Appellate District, Division One
D076318, D076337

San Diego County Superior Court
37-2017-00009873-PR-TR-CTL,
37-2018-00038613-CU-MC-CTL

August 3, 2023

Chief Justice Guerrero authored the opinion of the Court, in which Justices Corrigan, Liu, Kruger, Groban, Jenkins, and Evans concurred.

TURNER v. VICTORIA

S271504

Opinion of the Court by Guerrero, C. J.

Under Corporations Code sections 5142 and 5233,[1] a director of a nonprofit public benefit corporation may "bring an action" to remedy a breach of the charitable trust or recover damages for self-dealing transactions by other directors. (§§ 5142, subd. (a), 5233, subd. (c).) Similarly, under section 5223, the trial court may "at the suit of a director" remove from office any director guilty of malfeasance. (§ 5223, subd. (a).) We granted review to decide whether a director of a charitable corporation who loses that position after instituting a lawsuit against fellow directors under sections 5142, 5233, and 5223 (hereinafter the director enforcement statutes) also loses standing to maintain the lawsuit.

An examination of the statutory text, its surrounding context, the legislative history, and the overarching purpose of the director enforcement statutes reveals that the statutes do not impose a continuous directorship requirement that would require dismissal of a lawsuit brought under these statutes if the director-plaintiff fails to retain a director position. Each statute grants a director standing to bring a lawsuit. None expressly requires continued service as a director as a condition

---

[1] All further statutory references are to the Corporations Code unless otherwise specified.

1

for pursuing the lawsuit, and there is no indication that the Legislature intended to impose such a condition.

In finding a requirement of continued service, the Court of Appeal below analogized actions under the director enforcement statutes to shareholder derivative lawsuits. (*Turner v. Victoria* (2021) 67 Cal.App.5th 1099, 1128–1129 (*Turner*).) However, the language of the governing statutes is significantly different in the nonprofit and for-profit contexts. Furthermore, the position adopted by the Court of Appeal would permit gamesmanship by directors accused of wrongdoing. Directors who are sued would be able to terminate the litigation by removing the plaintiffs from office, refusing to reelect the individuals, or otherwise making it more difficult for the plaintiffs to retain their positions. Because potential plaintiffs would likely be discouraged from filing complaints, this framework would shift to the Attorney General the burden of initiating lawsuits aimed at ensuring that nonprofit public benefit corporations serve their charitable purpose. But, as we have long recognized, "the need for adequate enforcement" of the law governing charities cannot be "wholly fulfilled" by having the Attorney General act as the exclusive entity empowered to institute litigation. (*Holt v. College of Osteopathic Physicians & Surgeons* (1964) 61 Cal.2d 750, 755 (*Holt*).)

An interpretation of the statutes that does not require a director-plaintiff to maintain a director position at a nonprofit corporation throughout litigation is " ' "the construction that comports most closely with the apparent intent of the lawmakers," ' " and the one that we " ' "[u]ltimately . . .

choose." ' " (*Lee v. Hanley* (2015) 61 Cal.4th 1225, 1233 (*Lee*).) We therefore reverse the judgment of the Court of Appeal.[2]

## I. FACTUAL AND PROCEDURAL BACKGROUND

"Because this case comes to us at the demurrer stage, we take as true all properly pleaded material facts — but not conclusions of fact or law." (*Southern California Gas Leak Cases* (2019) 7 Cal.5th 391, 395.) The plaintiff in this case is Debra Turner; the defendants are Laurie Anne Victoria, Joseph Gronotte, Gregory Rogers, and Anthony Cortes.[3] When plaintiff initiated the litigation, she and all four defendants were directors of the Conrad Prebys Foundation (the Foundation), a nonprofit public benefit corporation named for its founder.

Conrad Prebys (Prebys) was a wealthy philanthropist. In addition to the Foundation, Prebys created an inter vivos trust, the Conrad Prebys Trust (the Trust). Prebys funded the Trust and directed it to make distributions to specific beneficiaries after his death. The assets remaining after the gift distributions were to "go to the Foundation to be used for charitable purposes."

Under the Foundation's bylaws, all its directors were also members of the Foundation, and the Foundation had no other members. Most of the directors had a personal relationship with

---

[2]     We do not decide whether the director-plaintiff in this case also has standing under section 5710 (the member enforcement statute), which allows members of a nonprofit public benefit corporation to "institute[] or maintain[]" an action on behalf of the corporation if certain conditions are met. (§ 5710, subd. (b).)

[3]     By law, plaintiff also sued as nominal defendants the nonprofit public benefit corporation itself and the Attorney General. (See §§ 5223, subd. (a); 5233, subd. (c).)

Prebys. For instance, Victoria was the Chief Executive Officer of a company Prebys owned, and plaintiff was Prebys's "life partner, living [with Prebys] as a couple for over 16 years until his death" in 2016.

In addition to her role at the Foundation, Victoria was the trustee of the Trust. At the initial meeting of the Board of Directors (Board) after Prebys's death, Victoria and an attorney informed the directors that Prebys's son, Eric Prebys, might contest the Trust.[4] Although Eric was originally a beneficiary under the Trust, Prebys eliminated the gift to Eric two years before he died. The Board was informed that Eric had hired counsel with the intention of challenging his disinheritance on the grounds that his father lacked mental competence and was unduly influenced by plaintiff.

In her role as trustee, Victoria wanted to settle Eric's claims, and she discussed with the Board an appropriate settlement amount. Plaintiff was the only director who opposed such a settlement. The Board eventually voted to authorize a maximum settlement of $12 million plus the payment of estate taxes. In early 2017, Victoria, on behalf of the Trust, settled with Eric for a total sum of $15 million, paying $9 million to Eric directly and the remainder in taxes.

On May 15, 2017, while she was still a director, officer, and member of the Foundation, plaintiff filed a petition in probate court against her fellow board members. (*Turner*, *supra*, 67 Cal.App.5th at pp. 1113–1114.) The suit included claims for breach of charitable trust, breach of the Board

---

[4] To avoid confusion, we refer to Eric Prebys by his first name.

members' duty of care, self-dealing in violation of the Board members' duty of loyalty, and removal of members of the Board for dishonest acts and gross abuse of authority. (*Id.* at p. 1114.) All causes of action were based on the Board's handling of the settlement with Eric. (*Ibid.*)

The director-defendants were aware of the lawsuit prior to a board meeting held in November 2017, at which the Board conducted an election of Foundation directors and officers. The four director-defendants nominated and seconded one another for reelection as directors and appointment as officers. No one nominated plaintiff for reelection as a director or an officer, despite plaintiff having made "clear she wanted to remain on the Foundation's Board." As a result, plaintiff lost her position as director, officer, and, consequently, member of the Foundation. Plaintiff alleges that her loss of position was an act of retaliation by the director-defendants in response to her lawsuit.

Subsequent to the November 2017 board election, the probate court ordered the four causes of action discussed above severed and transferred for resolution in a separate civil proceeding. (*Turner*, *supra*, 67 Cal.App.5th at p. 1115.) The court made clear that the new proceeding "would relate back to the date of the original petition," when plaintiff was still a director of the Foundation. (*Ibid.*) Plaintiff subsequently filed a civil complaint in the superior court, alleging causes of action under sections 5142, 5233, 5223, and 5710. (*Turner*, at p. 1116.) Defendants demurred, arguing that plaintiff no longer had standing to maintain the lawsuit because she was no longer a director or member of the Foundation. (*Ibid.*) The trial court agreed and dismissed the claims against defendants. (*Ibid.*)

The Court of Appeal affirmed. Analogizing to the standing rules that apply in shareholder derivative actions, the court concluded plaintiff was required to maintain a "continuous relationship" with the Foundation to proceed with her suit. (*Turner*, *supra*, 67 Cal.App.5th at p. 1108; see *id.* at pp. 1137–1138.) The court disagreed with *Summers v. Colette* (2019) 34 Cal.App.5th 361 (*Summers*), which held that a plaintiff who had been removed as a director of a nonprofit corporation did not lose standing to maintain this type of action. (*Turner*, at p. 1129; *Summers*, at p. 364.)

We granted review to resolve the conflict in authority.

## II. DISCUSSION

This case involves a question of statutory construction, which we review de novo. (See, e.g., *Lee*, *supra*, 61 Cal.4th at p. 1232.) Our specific task is to determine whether plaintiff maintained standing under the statutory scheme. "At its core, standing concerns a specific party's interest in the outcome of a lawsuit." (*Weatherford v. City of San Rafael* (2017) 2 Cal.5th 1241, 1247.) "When, as here, a cause of action is based on statute, standing rests on the provision's language, its underlying purpose, and the legislative intent." (*Kim v. Reins International California, Inc.* (2020) 9 Cal.5th 73, 83 (*Kim*).) Consistent with this approach, in part II.A., *post*, we provide an overview of the director enforcement statutes. We subsequently analyze the provisions' text (part II.B.), context (part II.C.), and purpose (part II.D.). After concluding that these indicia of intent do not support a continuous directorship requirement, we consider and reject defendants' remaining arguments in favor of such a requirement (part II.E.).

6

### A. The Relevant Statutes

The provisions at issue — sections 5142, 5233, and 5223 — are part of the Nonprofit Corporation Law (§ 5000 et seq.). Enacted in 1978 and effective in 1980 (Stats. 1978, ch. 567), the legislation was the result of years-long study and collaboration between the Assembly Select Committee on the Revision of the Nonprofit Corporations Code and the State Bar's Committee on Nonprofit Corporations. (See Assemblyman John T. Knox, letter to Governor Edmund G. Brown, Jr. (1977–1978 Reg. Sess.) Aug. 29, 1978, Governor's chaptered bill files, ch. 567.) When signed into law, the Nonprofit Corporation Law provided "a new, comprehensive," standalone set of statutes to guide the conduct of charities that had been regulated in a piecemeal fashion under the General Corporation Law (GCL) (§ 100 et seq.). (Legis. Counsel's Dig., Assem. Bill No. 2180 (1977–78 Reg. Sess.) Stats. 1978, ch. 567, Summary Dig., p. 141 (Summary Digest).)

One type of charity covered by the Nonprofit Corporation Law is the nonprofit public benefit corporation, an entity formed for "any public or charitable purposes." (§ 5111.) Such a corporation is subject to rules designed to ensure that the entity serves the public or charitable purpose for which it was created. For example, unlike a for-profit company that may regularly distribute dividends to its shareholders, a nonprofit public benefit corporation is prohibited from making distributions. (§ 5410.) Similarly, the majority of persons serving on the board of a nonprofit public benefit corporation may not be "interested persons," in other words, individuals receiving compensation from the corporation, or relatives of such individuals (except that a director may be paid "reasonable compensation . . . as director"). (§ 5227, subds. (a) & (b)(1).) Directors and officers of

a nonprofit public benefit corporation also are charged with a duty of care and must refrain from self-dealing transactions. (See §§ 5231, subd. (a), 5233.)

As relevant here, the Nonprofit Corporation Law specifies who may sue to enforce its provisions. Section 5142 addresses breaches of a charitable trust and declares that "any of the following may bring an action to enjoin, correct, obtain damages for or to otherwise remedy a breach of a charitable trust: [¶] (1) The corporation, or a member in the name of the corporation pursuant to Section 5710.[5] [¶] (2) An officer of the corporation. [¶] (3) A director of the corporation. [¶] (4) A person with a reversionary, contractual, or property interest in the assets subject to such charitable trust. [¶] (5) The Attorney General, or any person granted relator status by the Attorney General." (§ 5142, subd. (a).)

Section 5233 similarly specifies four categories of persons, in addition to the Attorney General, who are authorized to "bring an action" in the face of self-dealing transactions by interested directors. (§ 5233, subd. (c).) This provision states, "The Attorney General or, if the Attorney General is joined as an indispensable party, any of the following may bring an action in the superior court of the proper county for the remedies specified in subdivision (h) [governing self-dealing transactions]: [¶] (1) The corporation, or a member asserting the right in the name of the corporation pursuant to

_____

[5] Although a nonprofit public benefit corporation may "admit persons to membership," it may also have no members. (§ 5310, subd. (a).) The rights and obligations of members, as well as other guidelines for this class of persons, are specified in sections 5310 et seq.

Section 5710. [¶] (2) A director of the corporation. [¶] (3) An officer of the corporation. [¶] (4) Any person granted relator status by the Attorney General." (*Ibid*.)[6]

Section 5223, meanwhile, delineates circumstances in which a court may remove a director of a nonprofit public benefit corporation. It reads, "The superior court of the proper county may, at the suit of a director, or twice the authorized number (Section 5036) of members or 20 members, whichever is less, remove from office any director in case of fraudulent or dishonest acts or gross abuse of authority or discretion with reference to the corporation or breach of any duty arising under Article 3 (commencing with Section 5230) of this chapter, and may bar from reelection any director so removed for a period prescribed by the court." (§ 5223, subd. (a).) Section 5223 also permits the Attorney General to "bring an action" or "intervene in such an action brought by any other party." (*Id*., subd. (b).)

Plaintiff asserts standing under all the above provisions, as well as section 5710. Like the director enforcement statutes, section 5710 was enacted as part of the Nonprofit Corporation Law in 1978. (Stats. 1978, ch. 567, § 5, pp. 1787–1788.) Unlike the director enforcement statutes, section 5710 focuses exclusively on the ability of members of a nonprofit public benefit corporation to bring derivative actions, or actions asserting a right belonging to the corporation. (See *Grosset v. Wenaas* (2008) 42 Cal.4th 1100, 1108 (*Grosset*) ["An action is

---

[6]   Although section 5233 has been amended since it was initially enacted in 1978, "[t]he relevant portions of the statute involving who may bring an action for self-dealing" remain unchanged. (*Turner, supra,* 67 Cal.App.5th at p. 1123, fn. 9.) We therefore do not distinguish between section 5233 as it was enacted and the provision in its present form.

deemed derivative ' "if the gravamen of the complaint is injury to the corporation, or to the whole body of its stock and property without any severance or distribution among individual holders, or it seeks to recover assets for the corporation or to prevent the dissipation of its assets" ' "]; Black's Law Dict. (11th ed. 2019) p. 558, col. 1 [defining "derivative action" as "[a] lawsuit arising from an injury to another person" and within the context of corporations, as "[a] suit by a beneficiary of a fiduciary to enforce a right belonging to the fiduciary; esp., a suit asserted by a shareholder on the corporation's behalf against a third party (usu. a corporate officer) because of the corporation's failure to take some action against the third party"].)  Phrased in prohibitory terms, the provision states, "No action may be instituted or maintained in the right of any corporation by any member of such corporation" unless two conditions are met, one of which is that "[t]he plaintiff alleges in the complaint that plaintiff was a member at the time of the transaction or any part thereof of which plaintiff complains."  (§ 5710, subd. (b).)  The other condition requires that the plaintiff allege having made a demand on the corporation's board or state reasons for not having made such a demand.  (See *id*., subd. (b)(2).)

### B. Text

We begin our analysis by reviewing the statutory language, read in context.  (See, e.g., *Lee*, *supra*, 61 Cal.4th at p. 1232.)  We recognize that, particularly when viewed against the backdrop of our case law (discussed *post*), the language of the director enforcement statutes is susceptible to more than one interpretation.  At the same time, the statutes read in their broader statutory context "seem[] to point" to an absence of a continuous directorship requirement.  (*Grosset*, *supra*, 42 Cal.4th at p. 1113.)

Sections 5142 and 5233 employ the same wording, allowing a director of a nonprofit public benefit corporation to "bring an action." (§§ 5142, subd. (a), 5233, subd. (c).) Merriam-Webster defines to "bring" as "to cause to exist or occur in any of a number of ways," including to "institute" "legal action" or "complaint." (Webster's 3d New Internat. Dict. (1981) p. 278, col. 3, capitalization omitted; accord, *Lee, supra*, 61 Cal.4th at pp. 1232–1233 [in interpreting the words of a statute, we give them their "usual and ordinary meaning"].) Black's Law Dictionary likewise equates the phrase "bring an action" with "[t]o sue" or to "institute legal proceedings." (Black's Law Dict. (8th ed. 2004) p. 205, col. 1; see also Webster's 3d New Internat. Dict., at p. 1171 [defining "to institute" as "to originate and get established"]; Black's Law Dict. (5th ed. 1979) p. 174, col. 1 [in defining "bring suit," stating, "To 'bring' an action or suit has a settled customary meaning at law, and refers to the initiation of legal proceedings in a suit. [Citation.] A suit is 'brought' at the time it is commenced"].)

Here, plaintiff "sue[d]," "institute[d] [a] legal proceeding[]," and "cause[d]" an action "to exist" by filing a petition in the probate court (and a subsequent civil complaint that relates back to the probate filing date). (Accord, Code Civ. Proc., § 350 ["An action is commenced, within the meaning of this title, when the complaint is filed"].) Plaintiff was a director when she did so. As such, plaintiff appears to have fulfilled the requirements of Corporations Code sections 5142 and 5233 that a person must be a director in order to "bring an action." (Corp. Code, §§ 5142, subd. (a), 5233, subd. (c).)

Similarly, section 5223 describes remedies obtainable "at the suit of a director." (§ 5223, subd. (a).) No party argues we should interpret this statute differently from sections 5142 and

5233. Indeed, the three provisions appear to be in accord: "the suit of a director" existed when plaintiff, as a director, commenced her action by filing the petition. (§ 5223, subd. (a).) The director enforcement statutes clearly indicate they require an individual who brings a lawsuit to be a director when that person institutes the action. They do not, however, contain any express requirement of continuous directorship.

Notably, the language of the director enforcement statutes differs from the language of section 800, the provision governing derivative shareholder suits in the context of for-profit organizations. In contrast to sections 5142, subdivision (a)'s and 5233, subdivision (c)'s use of the phrase "may bring an action," section 800, subdivision (b) refers to an action that "may be instituted *or maintained*" (italics added). (See, e.g., *People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.* (2005) 37 Cal.4th 707, 717 [" 'When the Legislature uses materially different language in statutory provisions addressing the same subject or related subjects, the normal inference is that the Legislature intended a difference in meaning' "].)

We addressed the meaning of this latter phrase — "may be instituted or maintained" (§ 800, subd. (b)) — in *Grosset*. There, we confronted the question of whether a shareholder-plaintiff "lacks standing to continue litigating [a] derivative action" brought on behalf of a for-profit corporation "because he no longer owns stock in [the corporation]." (*Grosset, supra,* 42 Cal.4th at p. 1104.) We were required to construe section 800, which states, "No action may be instituted or maintained in right of any domestic or foreign corporation by any holder of shares or of voting trust certificates of the corporation" unless certain conditions exist. (§ 800, subd. (b).) We reasoned that "[t]he phrase 'instituted *or maintained*' (italics

added) appears on its face to be more restrictive than the sole term 'instituted' . . . [citation], and it seems to imply that only a shareholder may initiate or maintain a derivative action." (*Grosset*, at p. 1111.) In other words, section 800 appears to contain a continuous ownership requirement, such that a shareholder who no longer owns shares in a corporation may not maintain a suit brought pursuant to the provision. (See *Grosset*, at pp. 1113–1114 [stating that although "the 'instituted or maintained' language does not clearly impose it," the language "seems to point to a continuous ownership requirement"].)

The statutes before us lack language similar to section 800. As the *Summers* court observed, "[T]he absence of something comparable to the phrase 'or maintained' in sections 5233 and 5142 points away from a continuous directorship requirement in the same way that phrase's presence in section 800 'point[s] to' (*Grosset*, *supra*, 42 Cal.4th at p. 1113) a continuous stock ownership requirement." (*Summers*, *supra*, 34 Cal.App.5th at p. 370.)

Construing the statutory language as requiring director status only at the time an action is brought is also consistent with other instances outside of the Corporations Code in which the concept of bringing an action is equated with litigation being commenced — not *maintained*. For example, various statutes of limitations specify that no action may "be brought" beyond a prescribed timeframe. (See, e.g., Code Civ. Proc., § 337, subd. (a) [the time in which certain mortgage-related action "may be brought shall not extend beyond three months after the time of sale under such deed of trust or mortgage"]; *id.*, § 337.1, subd. (a) ["no action shall be brought to recover damages from any person performing . . . construction of an improvement to real property more than four years after the substantial

completion of such improvement"]; *id.* § 337.15, subd. (a) ["No action may be brought to recover damages from any person . . . who develops real property . . . more than 10 years after the substantial completion of the development"]; *id.*, § 337.2 ["Where a lease of real property is in writing, no action shall be brought under Section 1951.2 of the Civil Code more than four years after the breach of the lease"]; *id.*, § 339.5 ["Where a lease of real property is not in writing, no action shall be brought under Section 1951.2 of the Civil Code more than two years after the breach of the lease"]; *id.*, § 340.7, subd. (a) ["a civil action brought by, or on behalf of, a Dalkon Shield [a brand of contraceptive] victim against the Dalkon Shield Claimants' Trust . . . shall be brought within 15 years of the date on which the victim's injury occurred"]; *id.*, § 349.1 [changes to the borders of cities, counties, and the like "shall not be contested in any action unless such action shall have been brought within six months" of the change]; *id.*, § 349.2, subds. (1)–(3) [various suits relating to the offerings of public bonds must be "brought within six months"]; see also, e.g., *Straley v. Gamble* (2013) 217 Cal.App.4th 533, 537, 538 [in interpreting a limitations period which specifies that " '[n]o person . . . may bring an action to contest the trust more than 120 days from the date [on which the person is served],' " stating "we believe that the statutory phrase 'bring an action' is clear:  Appellant brought the action when he filed his petition"].)  These limitations provisions indicate that *bringing* an action is, at least in certain contexts, naturally understood as instituting or commencing it.

We draw further support from federal law.  In construing a federal statute penalizing insider trading, the United States Supreme Court relied on the dictionary meaning of the term "institute," explaining that "the word 'institute' is commonly

14

understood to mean 'inaugurate or commence; as to institute an action.' " (*Gollust v. Mendell* (1991) 501 U.S. 115, 124 (*Gollust*).) Thus, a provision's language declaring that actions targeting insider trading "may be instituted at law or in equity . . . by the issuer, or by the owner of any security of the issuer" (15 U.S.C. § 78p(b)) on its face prescribed only "conditions existing at the time an action is begun." (*Gollust*, at p. 124; but cf. *id.* at pp. 125, 126 [concluding that a plaintiff must "have some continuing financial interest in the outcome of the litigation . . . for the sake of furthering the statute's remedial purposes . . . and to avoid the serious constitutional question" raised by Article III's imposition of a "case-or-controversy limitation on federal court jurisdiction"].) The high court's reading of this text supports our reading of the director enforcement statutes as requiring that a plaintiff be a director only "at the time an action is begun." (*Id.* at p. 124.)

In sum, nothing in the wording of the statutes indicates that they impose a continuous directorship requirement. We acknowledge, however, that the phrase "bring an action" can mean different things in different circumstances. We therefore proceed to consider the statutes' historical context and purpose. (See, e.g., *Kim, supra*, 9 Cal.5th at p. 83; *Lee, supra*, 61 Cal.4th at p. 1233.) We find that these additional indicia of legislative intent reinforce our understanding that the director enforcement statutes do not require continuity in service as a condition for maintaining standing.[7]

---

[7] We have no occasion to determine how the words "bring an action" (or similar phrasing) may operate in different statutory contexts not here considered.

### C. Historical Context

As mentioned, the statutes at issue here were enacted as part of the Nonprofit Corporation Law. That legislation was itself a substantial undertaking that yielded "a new, comprehensive" set of regulations to "govern [charitable corporations] to the exclusion of the General Corporation Law," which had previously guided the conduct of such organizations. (Summary Digest, *supra*, at p. 141.) Perhaps because the director enforcement statutes (and specifically the subdivisions concerning standing) were only a small part of the "comprehensive" Nonprofit Corporation Law, they did not receive much attention in the available legislative history materials. (*Ibid.*) Nonetheless, we can draw insight from the history of the director enforcement statutes by comparing them with provisions that were superseded by the new Nonprofit Corporation Law.

Comparing section 5142 to provisions which preceded it reveals the Legislature's intent to afford standing to a wider group of individuals. Section 5142 is traceable to Corporations Code former section 9505 (added by Stats. 1947, ch. 1038) and Civil Code former section 605c (added by Stats. 1931, ch. 871, § 1). (Derivation Notes, Deering's Ann. Corp. Code (2021 ed.) foll. § 5142.) Both provisions restricted the ability to bring suit to just one entity: the Attorney General.[8] In contrast, as

_____

[8]  Former section 9505 of the Corporations Code specified that "[a] nonprofit corporation which holds property subject to any public or charitable trust is subject at all times to examination by the Attorney General, on behalf of the State, to ascertain the condition of its affairs and to what extent, if at all, it may fail to comply with trusts which it has assumed or may

previously explained, section 5142 authorizes five categories of persons to seek redress in addition to the Attorney General: the corporation, or a member of the corporation suing derivatively; "[a] person with a reversionary, contractual, or property interest in the assets subject to such charitable trust"; "any person granted relator status by the Attorney General"; and an officer or director of the corporation. (§ 5142, subd. (a).)

The same expansion of standing appears in section 5223.[9] The court below described section 5223 as being "similar to the language of section 304 [of the GCL] involving an action to remove a director" of a for-profit corporation. (*Turner*, *supra*, 67 Cal.App.5th at p. 1121.) We view the statutes differently. Although sections 5223 and 304 share certain drafting similarities, they are different in substance. Section 304 specifies that "[t]he superior court of the proper county may, at the suit of shareholders holding at least 10 percent of the

---

depart from the general purposes for which it is formed. In case of any such failure or departure the Attorney General shall institute, in the name of the State, the proceedings necessary to correct the noncompliance or departure." Former section 605c of the Civil Code likewise provided that "[a] nonprofit corporation which holds property subject to any public or charitable trust shall be subject at all times to examination on behalf of the state . . . . Such right of examination shall pertain ex officio to the attorney general. In case of any such failure or departure the attorney general shall institute, in the name of the state, the proceedings necessary to correct the same."

[9] Section 5233 was a "new provision[] that did not have a direct correlation to the GCL." (*Turner*, *supra*, 67 Cal.App.5th at p. 1122.) Nonetheless, section 5233 is like section 5142 in that it, too, allows various persons other than the Attorney General to bring suit. (Compare § 5142, subd. (a), with § 5233, subd. (c).)

number of outstanding shares of any class, remove from office any director in case of fraudulent or dishonest acts." In contrast, section 5223 allows the court to remove any director "at the suit of a director, or twice the authorized number (Section 5036) of members or 20 members, whichever is less." (§ 5223, subd. (a).) Accordingly, section 5223 of the Nonprofit Corporation Law enables one more class of persons — directors — to bring suit to remove a board member than does section 304 of the GCL.[10]

In enacting the Nonprofit Corporation Law, the Legislature thus broadened standing, allowing more persons to bring suit than was previously possible. Although nothing in the legislative history speaks directly to the issue, declining to read a continuity requirement into sections 5142, 5233, and 5223 is consistent with the Legislature's intent to expand standing as a means to remedy abuses committed against a charitable corporation.

In advancing a different interpretation of the statutes involved here, the Court of Appeal pointed to language from the legislative history of the Nonprofit Corporation Law suggesting the Legislature intended for the new law to mirror the old GCL. (See *Turner*, *supra*, 67 Cal.App.5th at p. 1121.) The court acknowledged that the Nonprofit Corporation Law did include some innovations as compared to the old GCL. (See *Turner*, *supra*, 67 Cal.App.5th at p. 1122.) The court nevertheless concluded that "[t]he legislative history for this statutory

---

[10] The "authorized number . . . of members" referred to in section 5223 also does not correspond strictly to the 10 percent required under section 304. (See § 5036 [specifying the " 'authorized number' " as 5, 2.5, or 1/20 percent "of the voting power" depending on the "total number of votes entitled to be cast for a director"].)

scheme indicates . . . a clear intention to hew as closely to the law used for general corporations as possible." (*Id*. at p. 1123.) The inference from the court's logic is that we should construe sections 5142, 5233, and 5223 of the Nonprofit Corporation Law to contain a continuous directorship requirement, just as we construed section 800 of the GCL to require continuous ownership of shares.

The drafters of the Nonprofit Corporation Law indeed conveyed that the legislation "follows GCL format and language except where substantive differences otherwise require." (Assem. Select Com. on Revision of the Nonprofit Corp. Code, Summary of Assem. Bill Nos. 2180 and 2181 (1977–1978 Reg. Sess.) Apr. 21, 1978, p. 2.) "This means," said the drafters, "not only that the proposed law follows the GCL in general organization, but further, individual sections employ the GCL language whenever the same substantive results are intended." (*Ibid*.; see also Recommendation Relating to Nonprofit Corporation Law (Nov. 1976) 13 Cal. Law Revision Com. Rep. (1976) pp. 2227–2228.)

As discussed previously, however, the individual sections at issue here employ language *different* from that found in the GCL. The provisions of the Nonprofit Corporation Law broadened standing, extending it to directors of nonprofit public benefit corporations. In light of the material changes made and, as discussed below, the purpose underlying the director enforcement statutes, we are not persuaded that the Legislature intended "the same substantive results" to obtain between section 800 and the director enforcement statutes. (Assem. Select Com. on Revision of the Nonprofit Corp. Code, Summary of Assem. Bill Nos. 2180 and 2181 (1977–1978 Reg. Sess.) Apr. 21, 1978, p. 2.)

## D. Purpose

"Standing rules for statutes must be viewed in light of the intent of the Legislature and the purpose of the enactment." (*White v. Square, Inc.* (2019) 7 Cal.5th 1019, 1024; see also, e.g., *Kim, supra,* 9 Cal.5th at p. 83.) In enacting the director enforcement statutes, the Legislature intended to provide safeguards against "breach[es] of a charitable trust" (§ 5142, subd. (a)), self-dealing by interested directors (see § 5233), "fraudulent" or "dishonest acts," and "gross abuse of authority" by directors of a charitable corporation (§ 5223, subd. (a)). Moreover, it is undisputed that the Legislature intended directors of a charity to have standing to sue to enforce these provisions. In light of that intent, we ask whether construing the statutes to include a continuous directorship requirement would " ' "promot[e]" ' " or " ' "defeat[]" ' " the law's purpose. (*Lee, supra,* 61 Cal.4th at p. 1233.)

A continuous directorship requirement would necessarily mean that when director-plaintiffs lose their positions at nonprofit public benefit corporations, they also lose the ability to continue litigating the lawsuits they had instituted. Knowing this, directors who are accused of wrongdoing could make it difficult for director-plaintiffs to retain their positions — whether by calling elections to remove them (see, e.g., *Summers, supra,* 34 Cal.App.5th at pp. 364–365; *Workman v. Verde Wellness Ctr., Inc.* (Ariz.Ct.App. 2016) 382 P.3d 812, 815 (*Workman*)); refusing to reelect directors when their terms expire; or otherwise erecting barriers to the directors' reelection (see, e.g., *Tenney v. Rosenthal* (N.Y. 1959) 160 N.E.2d 463, 467 (*Tenney*) ["reduc[ing] the membership of the board" so as to "ma[k]e it mathematically more difficult for the plaintiff to be re-elected"]). If successful, these types of actions would

effectively quash the litigation initiated by the director-plaintiffs. A continuous directorship requirement would therefore give directors, "themselves charged with fraud, misconduct or neglect," the incentive — and power — "to terminate the suit by effecting the ouster of the director-plaintiff." (*Id.* at p. 466.)

Conversely, a director-plaintiff would have little incentive to initiate a lawsuit, knowing it could lead to the loss of the plaintiff's directorship, and then end the lawsuit itself. Construing the director enforcement statutes in such a way would " ' "defeat[]" ' " rather than " ' "promote[]" ' " the purpose of the statutes:  to empower charitable corporate insiders to seek judicial redress. (*Lee, supra*, 61 Cal.4th at p. 1233.)

Long ago, we explained the need for corporate insiders to "supplement[] the Attorney General's power of enforcement." (*Holt, supra*, 61 Cal.2d at p. 755.)  In *Holt*, a case decided before the enactment of the director enforcement statutes, we confronted the question of whether "minority trustees of a charitable corporation[] can sue the majority trustees to enjoin their allegedly wrongful diversion of corporate assets." (*Id.* at p. 752.)  The Attorney General there had not granted relator status to the plaintiffs or otherwise consented to their bringing the action, and he had also decided not to bring his own enforcement action. (*Id.* at p. 752.)  Before us, the defendants asserted that only the Attorney General can bring such a suit. (*Id.* at p. 753.)  We rejected the argument, reasoning that exclusive standing by the Attorney General cannot "wholly" solve the problem of "providing adequate supervision and enforcement of charitable trusts." (*Id.* at pp. 754, fn. omitted, & 755.)  "The Attorney General," we said, "may not be in a position to become aware of wrongful conduct or to be sufficiently

familiar with the situation to appreciate its impact, and the various responsibilities of his office may also tend to make it burdensome for him to institute legal actions except in situations of serious public detriment." (*Id*. at p. 755.) Although we recognized that charities should be protected "from harassing litigation," this consideration did not dissuade us from allowing trustees to sue because they " 'are both few in number and charged with the duty of managing the charity's affairs.' " (*Ibid*.) Furthermore, we emphasized the informational advantages held by insiders like a trustee. A trustee, we declared, is " 'in the best position to learn about breaches of trust and to bring the relevant facts to a court's attention.' " (*Id*. at p. 756.) Balancing the various policy considerations, we held that trustees of a charitable corporation have standing to sue their fellow trustees. (*Id*. at p. 757.)

Although we were not interpreting the same statutory scheme in *Holt* that is now before us, some of the same considerations apply. As the Attorney General, appearing here as amicus curiae, acknowledges, he cannot "work alone" to enforce the law governing charities. Currently, there are more than 110,000 charitable organizations registered in California, holding assets of over $850 billion. (Charitable Trusts Section, Cal. Dept. of Justice, Attorney General's Guide for Charities (June 2021) p. 1, at <https://www.oag.ca.gov/system/files/media/Guide%20for%20Charities.pdf> [as of Aug. 3, 2023] (Attorney General's Guide).)[11] The Attorney General stresses that he "cannot have the kind of

_____

[11] All Internet citations in this opinion are archived by year, docket number, and case name at <http://www.courts.ca.gov/38324.htm>.

intimate knowledge about the use (or misuse) of charitable assets that directors of charities enjoy," and he cannot police such a large and diverse group of charitable organizations by himself. Notably, the Legislature did not intend that the Attorney General do so. Instead, the Legislature intended for directors of charitable organizations to sue to enforce the law governing such organizations. We best " ' "promot[e]" ' " that intent by not reading the director enforcement statutes as operating to strip director-plaintiffs of their standing as soon as they lose their position at the charity. (*Lee*, *supra*, 61 Cal.4th at p. 1233.)

The cases cited by defendants do not support a continuous directorship requirement. Defendants rely on *Cal. S. R. R. Co. v. S. P. R. R. Co.* (1884) 65 Cal. 394 to support their claim that bringing an action refers to more than just filing a complaint. The corporate defendant in that eminent domain case sought to change the place of trial from San Diego, the situs of the condemned land, to San Francisco, its corporate residence. (*Id.* at p. 394.) The trial court refused, and we affirmed. (*Id.* at pp. 394–395.) In rejecting the defendant's argument, we concluded that language within former section 1243 of the Code of Civil Procedure providing "all proceedings under the title in regard to eminent domain, [are] *to be brought* in the Superior Court of the county in which the property is situated" indicated that the trial should not be transferred from the Superior Court of San Diego. (*Cal. S. R. R. Co.*, at p. 395, italics added.) We reasoned that "[t]his language means something more than that the proceeding must be commenced in such Superior Court." (*Ibid.*) Practical considerations specific to the eminent domain context led us to read "something more" into that provision. (*Ibid.*) Specifically, we were concerned about witness

availability. We said: "There are strong reasons why such proceeding [relating to eminent domain] should be had in the county where the land sought to be condemned is situated. The compensation for the land sought to be taken is to be determined upon testimony, and the witnesses most competent to speak upon this subject will usually be found in the county referred to." (*Ibid*.) Absent similar policy considerations, our holding in this nearly 140-year-old precedent provides little reason to conclude that, in this particular case, "to be brought" should mean "something more than . . . commenced." (*Ibid*.)

More recently, we declined to "adopt a technical reading of the word 'brought,' " appearing in an agreement, "as referring only to the initiation of a lawsuit." (*Mountain Air Enterprises, LLC v. Sundowner Towers, LLC* (2017) 3 Cal.5th 744, 755.) The relevant contractual provision in that case stated, " 'If any legal action or any other proceeding, including arbitration or an action for declaratory relief[,] is brought for the enforcement of this Agreement . . . , the prevailing party shall be entitled to recover reasonable attorney fees . . . .' " (*Id*. at p. 752, italics omitted.) We determined that an assertion of the agreement as an affirmative defense in a breach of contract action did not trigger the attorney fees provision. (*Id*. at pp. 747, 752–754.) In rejecting the defendants' argument that our interpretation conveyed that the contractual term "brought" referred only to the initiation of a lawsuit, we explained we refused to adopt such a "technical reading" of the term because, as used in the contract, the word " 'brought' simply supplies further context to the relevant phrase 'brought for the enforcement of this Agreement or because of an alleged dispute.' " (*Id*. at p. 755.) Because a provision that reads, "If any legal action . . . is brought for the enforcement of this Agreement" is not

substantively different from one reading "If any legal action . . . is for the enforcement of this Agreement," we did not adopt a cabined view of the word "brought."

The interpretive issue before us is materially different from the situation in *Mountain Air Enterprises*. Whereas the context surrounding the word "brought" in that case counseled against a narrow interpretation of that term, here there is no comparable contextual clue that justifies a similarly broad construction of the relevant "bring an action" phrasing within sections 5142 and 5233. To the contrary, the language within these sections declaring that a person must be a director to "bring an action" may reasonably be interpreted as requiring only that a director initiate a lawsuit, and the purpose underlying the statutes strongly supports that more limited reading.

*Curtis v. County of Los Angeles* (1985) 172 Cal.App.3d 1243 is similarly distinguishable. The court in that case examined Code of Civil Procedure section 1038, subdivision (a), which requires the fact finder to "determine whether or not the plaintiff . . . brought the proceeding with reasonable cause." In evaluating an argument that this provision allows an award of costs only when an action was *brought* in bad faith, not when it was *maintained* in bad faith, the court cited an analysis prepared for the Senate Committee on the Judiciary that expressly stated the purpose of the statute: " '[T]o allow public entities to recover the cost of defending frivolous lawsuits brought against them.' " (*Curtis*, at p. 1250.) The court reasoned that "[i]f a frivolous lawsuit was only *filed* or *commenced* but not *maintained* or *prosecuted*, clearly there would be little or no cost involved in defending against it." (*Ibid*.) The court therefore concluded that "the Legislature

intended the word 'brought' to include *continuing* the action in bad faith." (*Ibid.*) But there is no comparable legislative history or statutory purpose that favors the same conclusion in this case.

The authorities cited by defendants simply reveal that phrases like "bring an action" may take on different meanings in different contexts. That is unsurprising. Here, the text of the statutes, read in light of their background and especially their purpose, conveys that the Legislature did not intend to incorporate a continuous directorship requirement when it enacted sections 5142, 5233, and 5223.

### E. Other Counterarguments

We also reject as unpersuasive other reasons the Court of Appeal and defendants have provided for adopting a continuous directorship requirement.

### 1. *"Ordinary" Standing Requirement*

The Court of Appeal viewed the continuous directorship requirement as a "generally applicable standing principle[]" and concluded that "nothing suggests the Legislature intended to depart" from that principle. (*Turner*, *supra*, 67 Cal.App.5th at p. 1123; see also *id.* at pp. 1108, 1130, 1134.) To support its position that a continuous directorship requirement operates as an "ordinary standing requirement" (*id.* at p. 1130), the court cited *Californians for Disability Rights v. Mervyn's, LLC* (2006) 39 Cal.4th 223, 232–233 (*Mervyn's*), which states, "For a lawsuit properly to be allowed to continue, standing must exist at all times until judgment is entered and not just on the date the complaint is filed." We agree with the Attorney General, however, that *Mervyn's* simply affirms that "the requirements of any standing statute must be met throughout the litigation."

It does not necessarily shed light on the specific requirements of any particular standing statute, including the statutes we interpret here.

In *Mervyn's*, we were confronted with a unique situation in which the applicable statutory standing requirements were amended during the pendency of the litigation. Although the plaintiff in the case satisfied the initially applicable standing requirements, the plaintiff did not meet the standing requirements as amended. (*Mervyn's*, *supra*, 39 Cal.4th at pp. 227–228.) It made sense in that context to explain that "standing must exist at all times" in order for a lawsuit "to be allowed to continue." (*Id.* at pp. 232–233.) No comparable circumstances exist here, where the standing requirement has been the same throughout the litigation: the plaintiff must have been a director of the charitable organization at the time the lawsuit commenced. Since plaintiff has satisfied this requirement "at all times" during the litigation, she has standing to pursue her claims, consistent with *Mervyn's.* (*Id.* at p. 233.)

We recently employed a similar approach to ascertain standing — in which we considered the statutory language and other indicia of legislative intent — in *Kim*. There, we addressed the issue of whether "employees lose standing to pursue a claim under the Labor Code Private Attorneys General Act . . . if they settle and dismiss their individual claims." (*Kim*, *supra*, 9 Cal.5th at p. 80, fn. omitted.) To answer that question, we examined the statutory language, purpose, context, and history of the relevant standing statute (*id.* at pp. 83–91) and concluded that the employees did not lose standing to pursue Private Attorneys General Act claims when "they settle[d] and dismiss[ed] their individual claims" (*Kim*, at p. 80). Applying a

comparable analysis here, we conclude that the statutes before us do not impose a continuous directorship requirement.

### 2. *Reliance on* Grosset

The Court of Appeal relied heavily on the reasoning of *Grosset*. (See *Turner, supra,* 67 Cal.App.5th at pp. 1125–1129.) It is true that in *Grosset* we held that section 800 — the for-profit counterpart to section 5710 — contains a continuous ownership requirement. (*Grosset, supra,* 42 Cal.4th at p. 1119.) But we find the circumstances here to be distinguishable.

Consistent with our ordinary principles of statutory interpretation, we began our analysis in *Grosset* with the text of the relevant statute. (*Grosset, supra,* 42 Cal.4th at pp. 1111–1113.) Section 800 speaks in terms of actions that " 'may be instituted *or maintained.*' " (*Grosset,* at p. 1111.) As previously discussed, that language is absent from the director enforcement statutes governing nonprofit corporations, and its absence "points away from a continuous directorship requirement." (*Summers, supra,* 34 Cal.App.5th at p. 370.)

*Grosset* is distinguishable in other respects as well. We noted in *Grosset* that section 800 "identif[ies] what a plaintiff must allege in a complaint to establish standing in a shareholder's derivative action." (*Grosset, supra,* 42 Cal.4th at p. 1113.)[12] "Given this circumstance," we said, "the failure to

---

[12] Section 800, subdivision (b) provides: "No action may be instituted or maintained in right of any domestic or foreign corporation by any holder of shares or of voting trust certificates of the corporation unless both of the following conditions exist: [¶] (1) The plaintiff alleges in the complaint that plaintiff was a shareholder, of record or beneficially, or the holder of voting

explicitly address an issue that might later arise during the pendency of an action, such as the loss of the plaintiff's stock, is hardly surprising." (*Grosset*, at p. 1113.) Again, this circumstance does not exist in the present case. The director enforcement statutes do not merely specify "what a plaintiff must allege in a complaint to establish standing." (*Ibid*.) The statutes here are distinguishable on their face from the provision examined in *Grosset*. And indeed the statutory text, historical context, and legislative purpose underlying the statutes all suggest that the Legislature, by specifying who may "bring an action" (§§ 5142, subd. (a), 5233, subd. (c)) and referring to "the suit of" such persons (§ 5223, subd. (a)), did intend to permit former directors to continue litigating cases that they commenced when they held their board seats.

Beyond the statutory text, in *Grosset* we cited two considerations that led us to hold that section 800 incorporates a continuous ownership requirement. We first focused on the fact that any lawsuit brought by a shareholder on a corporation's behalf is necessarily derivative. (See *Grosset*, *supra*, 42 Cal.4th at p. 1114.) As we observed, "Because a derivative claim does not belong to the stockholder asserting it, standing to maintain such a claim is justified only by the stockholder relationship and the indirect benefits made possible thereby, which furnish the stockholder with an interest and incentive to seek redress for injury to the corporation." (*Ibid*.) A stockholder who stops owning shares in the corporation " 'no longer has a financial

_____

trust certificates at the time of the transaction . . . . [¶] (2) The plaintiff alleges in the complaint with particularity plaintiff's efforts to secure from the board such action as plaintiff desires, or the reasons for not making such effort."

interest in any recovery pursued for the benefit of the corporation.' " (*Ibid.*) The loss of this interest divests the stockholder of standing. (*Ibid.*) In other words, we determined that a shareholder could not "retain standing despite the loss of stock ownership [because that] would produce 'the anomalous result that a plaintiff with absolutely no "dog in the hunt" is permitted to pursue a right of action that belongs solely to the corporation.' " (*Ibid.*)

This analysis does not carry over to the nonprofit context because a director of a charitable organization is materially different than a shareholder of a for-profit corporation. Unlike shareholders who stand to benefit financially from pursuing derivative actions on behalf of a for-profit corporation (most obviously, through an increase in the value of their shares),[13] directors have little to no financial interest in the charitable corporations. Although the law permits directors of a nonprofit public benefit corporation to be paid "reasonable compensation" (§ 5227, subd. (b)(1)), in reality, "[m]ost directors serve as volunteers and are not paid for their service as directors." (Attorney General's Guide, *supra*, at p. 52.) They likely join the board of a charitable corporation because they have a personal connection to the individual responsible for the creation of the

---

[13] See, e.g., *Workman, supra*, 382 P.3d at p. 819 ("the derivative plaintiff essentially stands in the shoes of the corporation to enforce the rights of the corporation, and the primary interest the shareholder has in doing so is by virtue of the related interest in protecting his or her shares").

charity,[14] affinity with the causes the charity serves,[15] or both. As such, their connection to the charity and interest in its well-being are not solely tied to their formal status as directors. When directors lose their position at the charitable corporation, it cannot be said that they become " 'plaintiff[s] with absolutely no "dog in the hunt," ' " who therefore should be stripped of standing to maintain an action they instituted when they were directors. (*Grosset*, *supra*, 42 Cal.4th at p. 1114.)

Furthermore, unlike for-profit corporations, charitable organizations do not have shareholders with ownership interests in the charity. This means that, as pointed out by the Attorney General, the responsibility of directors "to assure the integrity of the charity's activities" is heightened. This heightened responsibility would be impeded if we adopted a rule that prohibited directors from pursuing actions aimed at protecting the charities after losing their directorship status. In short, as we previously recognized, "The differences between private and charitable corporations make the consideration of such an analogy [between the two settings] valueless." (*Holt*,

_____

[14]     In this case, plaintiff was Prebys's "life partner." (*Turner*, *supra*, 67 Cal.App.5th at p. 1109.) Other directors were close enough to Prebys to have received gifts from his trust.

[15]     A survey of over 900 directors of nonprofit organizations found that the vast majority (86 percent) of directors joined the boards out of a desire to "serve the organization and contribute to its success." (See Larcker et al., 2015 Survey on Board of Directors of Nonprofit Organizations (Apr. 2016) pp. 1, 7, Stanford Graduate School of Business and the Rock Center for Corporate Governance in collaboration with BoardSource and GuideStar,                                           at <https://www.gsb.stanford.edu/sites/default/files/publication-pdf/cgri-survey-nonprofit-board-directors-2015.pdf>     [as     of Aug. 3, 2023].)

*supra*, 61 Cal.2d at p. 755, fn. 4; see also *Tenney*, *supra*, 160 N.E.2d at p. 466 [although "there may be many similarities between the derivative action brought by a shareholder and one brought by a director — in both cases the action is prosecuted in the right and for the benefit of the corporation — there are important reasons why the rule of automatic disqualification upon loss of status should not be extended to the director's action"].)

We were also persuaded in *Grosset* by the fact that "the vast majority of other jurisdictions that have considered the issue require continuous stock ownership for standing to maintain a derivative lawsuit." (*Grosset*, *supra*, 42 Cal.4th at p. 1114, fn. omitted.) We see no comparable consensus among our sister courts concerning a continuous directorship requirement, in part because it seems few other jurisdictions "have considered the issue." (*Ibid.*) Decisions from New York and Arizona, the only two states that have directly addressed the question of whether there is a continuous directorship requirement, have held that a director of a charitable corporation may continue to prosecute an action even after losing reelection for office. (See *Tenney*, *supra*, 160 N.E.2d at p. 465; *Workman*, *supra*, 382 P.3d at pp. 819–820.) At the same time, decisions from Tennessee and another New York court hold that members (not directors) of a charitable corporation must "retain membership for the duration of the lawsuit." (*United Supreme Council AASR SJ v. McWilliams* (Tenn.Ct.App. 2019) 586 S.W.3d 373, 385 (*United Supreme Council*); see also *Pall v McKenzie Homeowners' Assn., Inc.* (App.Div. 2014) 995 N.Y.S.2d 400, 401–402 (*Pall*).)

These out-of-state authorities are not uniformly helpful to our analysis here, as they interpret statutory language different

from that contained in sections 5142, 5233, and 5223. And, unsurprisingly, our sister courts were often persuaded by the specific text, legislative history material, or surrounding context in reaching their conclusions. (See, e.g., *Pall, supra,* 995 N.Y.S.2d at p. 402 ["Because the N-PCL specifically eliminated the ability of less than five percent of shareholders to continue an action by posting security for expenses, we conclude that the ownership requirement of N-PCL 623(a) must continue throughout the action in order to maintain standing"]; *Workman, supra,* 382 P.3d at p. 819.)[16]

Insofar as an expert consensus exists, it is to be found in the Model Nonprofit Corporation Act and the Restatement of the Law, Charitable Nonprofit Organizations (Restatement). The Model Nonprofit Corporation Act, drafted by the American Bar Association, has consistently taken the view that a director-plaintiff in a derivative proceeding must hold the position "at the time of bringing the proceeding." (1987 Revised Model Nonprofit Corporation Act, § 6.30 (ABA 1987) [specifying that "[a] proceeding may be brought in the right of a domestic or foreign corporation" by "any director" and that "[i]n any such proceeding, each complainant shall be a . . . director at the time of bringing the proceeding"]; Model Nonprofit Corporation Act, 3d ed. § 13.02 (ABA 2008) [likewise specifying that "[t]he plaintiff in a derivative proceeding must be a . . . director . . . at the time of bringing the proceeding"]; Model Nonprofit

---

[16]    The case most helpful to defendants — because it offers an extensive treatment of the issue and comes out in favor of a continuous membership requirement — relies heavily on *Grosset.* (See *United Supreme Council, supra,* 586 S.W.3d at pp. 384–385.) As discussed, however, *Grosset* is distinguishable from the present case.

Corporation Act, 4th ed. § 502 (ABA 2022) ["the plaintiff in a derivative proceeding must be a . . . director . . . at the time of bringing the proceeding"].) A reasonable inference is that the plaintiff does not need to maintain the position beyond the commencement of the action.

The Restatement likewise adopts an expansive approach to director standing in this context. Under the Restatement, among those that have standing "to bring a derivative action on behalf of a charity" are "a current member of the board of the charity" as well as "a former member of the board of the charity who is no longer a member for reasons related to that member's attempt to address the alleged harm to the charity." (Rest., § 6.02(b).) The amicus curiae brief submitted by the Reporter for the Restatement offers contextual details supporting this rule, noting that "[c]haritable-nonprofit boards are typically self-perpetuating" and "quite limited in size." Given the insularity of these boards and the fact that "some portion of the board will be defendants" in cases alleging breach of charitable trusts or fiduciary duties, "it is typical for a member of the board who brings a derivative suit to lose her position on the board." Moreover, unlike in matters involving for-profit companies where if a shareholder loses standing to bring a derivative suit, "another one of the many otherwise similarly situated people who own shares can easily step in to fill the role," charities cannot rely on such easy availability of directors to substitute in as a plaintiff. In light of these considerations, the Restatement does not prohibit board members "from maintaining a derivative claim they had standing to file" if they subsequently failed to be reelected. Indeed, the Restatement "goes further," allowing some *former* board members to bring a claim. (See Rest., § 6.02(b)(2)(B).)

In sum, defendants' reliance on *Grosset* is misplaced, and there is no consensus supporting a continuous directorship requirement. If anything, the prevailing view appears to be that a director of a nonprofit public benefit corporation has standing even if the director-plaintiff fails to retain a director position at the nonprofit. The Court of Appeal's decision runs counter to this view.

### 3. *The Relator Process*

The Court of Appeal reasoned that the relator process — under which lawsuits may be brought in the name of the people of California or the Attorney General — addresses any shortcomings of a continuous directorship requirement. The court explained that the relator process "provide[s] a mechanism for continued protection of the public benefit corporation if someone who was once within the defined class of individuals entitled to litigate on its behalf loses his or her status with the corporation and, thereby, standing." (*Turner*, *supra*, 67 Cal.App.5th at p. 1132.) According to the Court of Appeal, because a charitable organization "may continue to seek relief for claims of misconduct against its directors through the Attorney General, or through an individual to whom the Attorney General grants relator status under sections 5142, subdivision (a)(5) and 5233, subdivision (c)(4), even if a qualified individual who initiated suit on behalf of the corporation loses standing during the litigation," the organization is "adequately protect[ed] . . . from gamesmanship or improper attempts by the accused directors to terminate litigation." (*Id*. at pp. 1132,

1134.) We are not persuaded that the relator process answers the question before us.[17]

A relator is "[a]ny person desiring 'leave to sue' in the name of the people of the State of California under any law requiring the prior permission therefor of the Attorney General." (Cal. Code Regs., tit. 11, § 1; see also Blasko et al., *Standing to Sue in the Charitable Sector* (1993) 28 U.S.F. L.Rev. 37, 49 ["A relator is a party who is allowed to proceed in the name of the people or the attorney general when the power to sue otherwise resides wholly in that official"], fn. omitted.) A person wishing to proceed as a relator must file an application with the Attorney General and serve the application "upon the proposed defendant." (Cal. Code Regs., tit. 11, § 1.) The relator must show "why the proposed proceeding should be brought in the name of the people, and support[] the contention . . . that a public office or franchise is usurped, intruded into or unlawfully held or exercised by the proposed defendant." (*Id.*, § 2, subd. (b).) The proposed defendant may object and has 15 days "to appear and show cause" "why 'leave to sue' should not be granted." (*Id.*, §§ 3, 2, subd. (c).) If the Attorney General grants leave to sue, "the relator must . . . present to the Attorney General an undertaking executed to the State of California in the sum of $500, to the effect that the relator will pay any

---

[17] Although our decision in *Holt* predated enactment of the Nonprofit Corporation Law, it is instructive insofar as we recognized the benefits of allowing lawsuits to proceed even when the Attorney General concludes the suit lacks merit. (See *Holt, supra*, 61 Cal.2d at pp. 752, 757.) Similarly, here, we recognize there are instances when a lawsuit may proceed under the director enforcement statutes — without a continuous directorship requirement — even when the relator mechanism overseen by the Attorney General is not invoked.

judgment for costs or damages that may be recovered against the plaintiff." (*Id.*, § 6.) The relator must also supply sureties warranting that it "will pay . . . all costs and expenses incurred in the prosecution of the proceeding in which such 'leave to sue' is granted." (*Ibid.*)

In addition, a relator remains subject to the Attorney General's control throughout the litigation. A relator's complaint may be "changed or amended as the Attorney General shall suggest or direct" and, after filing, may not be "change[d], amend[ed] or alter[ed] . . . without the approval of the Attorney General." (Cal. Code Regs., tit. 11, § 7.) During proceedings, the relator must "notify the Attorney General, without delay, of every proceeding had, motion made, paper filed, or thing done in the proceeding, or in relation thereto, and must send to the Attorney General promptly a copy of every paper or document filed by any of the parties to the proceeding." (*Id.*, § 9.) The Attorney General retains ultimate control and "may at all times, at any and every stage of the said proceeding [involving a relator], withdraw, discontinue or dismiss the same, as the Attorney General may seem fit and proper; or may, at the Attorney General's option, assume the management of said proceeding at any stage thereof." (*Id.*, § 8.)

The Court of Appeal recognized that when "someone who was once within the defined class of individuals entitled to litigate on its behalf loses his or her status with the corporation and, thereby, standing" because of the imposition of a continuous directorship requirement, only two entities remain "to seek relief for claims of misconduct against . . . directors" of the nonprofit corporation: the Attorney General and individuals "to whom the Attorney General grants relator status." (*Turner, supra*, 67 Cal.App.5th at p. 1132.) The Court of Appeal was also

aware of "limitations on the resources of the Attorney General" to supervise the numerous charitable organizations in the state. (*Ibid*.) It acknowledged that in addition to "[s]taffing and funding limitations," "political concerns may discourage [the Attorney General from] 'investigation of charges against respectable trustees and corporate officers.'" (*Ibid*.) In light of these constraints associated with enforcement by the Attorney General, the court below relied on the availability and willingness of relators themselves to litigate on behalf of charities, and concluded that "[u]nder [its] interpretation," nonprofit public benefit corporations would still receive "adequate[]" protection against misconduct by its fiduciaries. (*Id*. at p. 1134.)

Yet, even when relators are entitled to litigate on behalf of a nonprofit public benefit corporation, their mere ability to do so does not alleviate the strain on the Attorney General's resources.[18] As the Attorney General notes, the relevant regulations "contemplate the Attorney General's active involvement, or at the very least active monitoring, in all relator

---

[18] Furthermore, relators do not appear to be a class of individuals permitted to bring suit under section 5223. That provision allows directors, members (of sufficient numerosity), and the Attorney General to bring suit. (§ 5223.) It also authorizes the Attorney General to "intervene in such an action brought by any other party." (*Id*., subd. (b).) Absent from the provision is any indication that persons granted relator status by the Attorney General may also prosecute actions to remove from office directors accused of "fraudulent or dishonest acts or gross abuse of authority or discretion with reference to the corporation or breach of any duty." (*Id*., subd. (a).)

suits."[19]  We agree with the Attorney General that "[s]hifting director-led suits into the relator process would place an additional burden on" that office.

The Court of Appeal was unsympathetic to the Attorney General's argument, declaring that "[t]he Attorney General should not be able to avoid its ongoing obligations to supervise charitable organizations simply because a director begins a lawsuit." (*Turner*, *supra*, 67 Cal.App.5th at p. 1134.)  But given the very real resource constraints the Attorney General faces, adding to that office's "ongoing obligations" may also inure to the detriment of charitable corporations.  (*Ibid.*; see also, e.g., Karst, *The Efficiency of the Charitable Dollar*: *An Unfulfilled State Responsibility* (1960) 73 Harv. L.Rev. 433, 437 ["if the public's interest is to be protected, someone must be assigned the job of supervising charitable fiduciaries.  Ordinarily, this task has fallen to the attorney general, and — just as ordinarily — supervision and enforcement have been irregular and infrequent"], fn. omitted.)

In addition, even supposing that the Attorney General would always grant relator status when it is in the interests of justice to do so, there may be a dearth of willing relators.  As

---

**19**    When a relator applies for leave to sue, the Attorney General must decide whether to grant leave.  (See Cal. Code Regs., tit. 11, § 1.)  Doing so may require him to wade through conflicting materials if the proposed defendant objects to relator status being granted.  (See *id*., § 2, subd. (c)(3), (4).)  Should the Attorney General choose to grant the application, he must approve of the complaint and give permission for any subsequent alterations to that pleading.  (*Id*., § 7.)  The Attorney General retains absolute control over the proceeding and, presumably, bears the responsibility to exercise that control with care.  (*Id*., § 8.)

noted, a relator must agree to pay "all costs and expenses incurred in the prosecution of the proceeding in which such 'leave to sue' is granted." (Cal. Code Regs., tit. 11, § 6.) Because of this requirement, there is some uncertainty regarding whether a relator can recover attorney fees, even upon obtaining relief for the nonprofit corporation. (See Fremont-Smith, Governing Nonprofit Organizations: Federal and State Law and Regulation (2004) p. 325.) As Professor Karst observed in his article, "[t]o deny the payment of these fees . . . radically decrease[s] the incentive for bringing a suit on behalf of the charity; for even if the plaintiff should succeed, the suit would be costly to him." (Karst, *supra*, 73 Harv. L.Rev. at p. 448.)

Based on these limitations associated with the relator process, we conclude that "[t]he mere existence of relator status . . . cannot eliminate all the ills" associated with a continuous directorship requirement. (Blasko, *supra*, 28 U.S.F. L.Rev. at p. 50.)

4. *Availability of Equitable Exceptions and Risk of Harassment*

We are not persuaded that other considerations invoked by defendants dictate an interpretation of the relevant statutes different from the one we have arrived at.

Recognizing that a continuous directorship requirement empowers accused directors to unilaterally terminate litigation against them, some defendants in this case suggest that equitable exceptions from the requirement may be created when a plaintiff "alleges with particularity facts showing [the director] was ousted in bad faith to block the litigation." (Accord, *Grosset*, *supra*, 42 Cal.4th at p. 1119 [noting, regarding shareholders' derivative actions in the context of for-profit corporations, that

"equitable considerations may warrant an exception to the continuous ownership requirement if the merger itself is used to wrongfully deprive the plaintiff of standing" but declining to "address such matters definitively in this case"]; *Turner*, *supra*, 67 Cal.App.5th at p. 1129 [attempting to distinguish *Summers*, *supra*, 34 Cal.App.5th 361, on the ground that "the *Summers* court was concerned with equitable considerations surrounding the removal of a director"].)

We decline to adopt defendants' proposed approach. Plaintiffs are rarely in a position to offer direct evidence that their removal as directors was retaliatory. An ousted director cannot readily establish fellow board members' motivations. An ousted director might observe the behavior of fellow director-defendants, but that behavior is inevitably subject to varying interpretations, and, as such, it might often be difficult to plead "with particularity" facts showing that one "was ousted in bad faith." This might in turn frequently add to the burden of litigation by requiring a hearing to determine the motive for the plaintiff's removal.

Defendants further contend that standing should cease when directors fail to retain their positions at the charities because, once separated from the organizations, the directors no longer owe fiduciary duties to the charities. Defendants suggest that allowing former directors to continue litigating would expose the nonprofit public benefit corporations to vexatious litigation, draining their resources from their charitable purposes. We have long been mindful of the need to "protect[] . . . charities from harassing litigation." (*Holt*, *supra*, 61 Cal.2d at p. 755; see also, e.g., Blasko, *supra*, 28 U.S.F. L.Rev. at pp. 41–42 [explaining that a rationale for "the exclusivity of attorney general enforcement" is the concern that "charities

would be embroiled in 'vexatious' litigation, constantly harassed by suits brought by parties with no stake in the charity" if " 'a third party were permitted to sue' "], fn. omitted.) Several considerations, however, lead us to conclude that allowing individuals such as plaintiff to maintain standing would not result in a significant increase in unmeritorious suits.

For one, " 'few in number' " are individuals who are former directors of nonprofit public benefit corporations who have ongoing lawsuits initiated while they sat on the board. (*Holt*, *supra*, 61 Cal.2d at p. 755.) For another, these individuals filed their complaints when they were directors " 'charged with the duty of managing the [nonprofit's] affairs' " and operating as fiduciaries of the organization. (*Ibid*.) There is no reason to believe that suits filed by fiduciaries become meritless as soon as the plaintiffs lose their affiliations with the nonprofit organizations, or that they are maintained thereafter purely out of improper motives. For yet another, the derivative nature of the enforcement actions means that any eventual recovery "will accrue to the direct benefit of the corporation and not to the [director] who litigated" the claims. (*Grosset, supra*, 42 Cal.4th at p. 1114; see also Blasko, *supra*, 28 U.S.F. L.Rev. at p. 53 ["Any damages recovered as a function of [a derivative] suit go to the corporation, never to those who brought the suit"], fn. omitted.) Even when, as here, a plaintiff prays for attorney fees, the plaintiff cannot obtain such fees without prevailing.[20] Accordingly, we conclude that charities are adequately protected from harassing litigation even without the

---

[20] We are not endorsing any specific theory for fees that plaintiff has alleged in her complaint. Nor are we expressing an opinion on the eligibility for fees should plaintiff prevail.

requirement that only current directors are allowed to maintain legal actions brought on their behalf. (See *Holt*, at p. 755.)

Finally, defendants raise the specter that without a continuous directorship requirement, a director who "just quit," or voluntarily disassociates from a nonprofit public benefit corporation, can continue harassing the organization through litigation. But of course, the director-plaintiff in this case did not simply quit. According to her allegations, which we must treat as true (see, e.g., *Southern California Gas Leak Cases*, *supra*, 7 Cal.5th at p. 395), plaintiff "wanted to remain on the Foundation's Board" and communicated as much to her fellow board members. But because none of the directors nominated or seconded her reelection, plaintiff lost her position.

In any event, the possibility that some directors may quit does not persuade us that a continuous directorship requirement should be the default rule. There appears to be no basis in the statutes to distinguish between former directors who were retaliated against and those who simply chose to quit. The statutes themselves do not carve out an exception for when a director or officer has been ousted or otherwise removed. (Accord, *Grosset*, *supra*, 42 Cal.4th at pp. 1115–1116 [the circumstances by which a stockholder loses his shares — and specifically whether that loss is voluntary — does not matter when determining whether a continuous stock ownership requirement is appropriate].) Director-defendants can find creative ways to affect ouster of a director-plaintiff. We decline to adopt a rule that would incentivize director-defendants to erect barriers to their fellow board members' retention of their position as a means to terminate litigation against them.

### III. CONCLUSION

We hold that a director of a nonprofit public benefit corporation who brings a lawsuit pursuant to Corporations Code sections 5142, 5233, and 5223 does not lose standing to continue litigating the suit if the director subsequently loses that position. Because the Court of Appeal reached a contrary conclusion, we reverse the judgment below.

**GUERRERO, C. J.**

**We Concur:**

**CORRIGAN, J.**
**LIU, J.**
**KRUGER, J.**
**GROBAN, J.**
**JENKINS, J.**
**EVANS, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  Turner v. Victoria

_____

**Procedural Posture** (see XX below)
**Original Appeal**
**Original Proceeding**
**Review Granted (published)** XX 67 Cal.App.5th 1099
**Review Granted (unpublished)**
**Rehearing Granted**

_____

**Opinion No.** S271054
**Date Filed:** August 3, 2023

_____

**Court:**  Superior
**County:**  San Diego
**Judges:**  Julia Craig Kelety and Kenneth J. Medel

_____

**Counsel:**

Cooley, Steven M. Strauss, Erin C. Trenda and Matt K. Nguyen for Plaintiff and Appellant.

Xavier Becerra and Rob Bonta, Attorneys General, Tania M. Ibanez, Assistant Attorney General, Caroline Hughes, Joseph N. Zimring, James M. Toma and Sandra I. Barrientos, Deputy Attorneys General, for the Attorney General of California as Amicus Curiae on behalf of Plaintiff and Appellant.

Norton Rose Fulbright US, Jeffrey B. Margulies and Kelly Doyle Dahan for Jill R. Horwitz, Nancy A. McLaughlin and the California Association of Nonprofits as Amici Curiae on behalf of Plaintiff and Appellant.

Gibson Dunn & Crutcher, Scott A. Edelman, Alexander K. Mircheff, Megan Cooney, Jillian Nicole London and Brian Yang for Defendant and Respondent Laurie Anne Victoria.

Henderson, Caverly, Pum & Trytten, Kristen E. Caverly, Lisa B. Roper and Stephen D. Blea for Defendant and Respondent Joseph Gronotte.

Procopio, Cory, Hargreaves & Savitch, Richard A. Heller, J. Christopher Jaczko and Sean Michael for Defendant and Respondent Gregory Rogers.

Seltzer Caplan McMahon Vitek, Reginal Vitek and Scott Walter Perlin for Defendant and Respondent Anthony Cortes.

Brownlie Hansen, Robert W. Brownlie; DLA Piper and S. Andrew Pharies for Defendant and Respondent The Conrad Prebys Foundation.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Steven M. Strauss
Cooley LLP
10265 Science Center Drive
San Diego, CA 92121
(858) 550-6006

Robert W. Brownlie
Brownlie Hansen LLP
10920 Via Frontera, Suite 550
San Diego, CA 92127
(858) 357-8001

Scott A. Edelman
Gibson Dunn & Crutcher LLP
2029 Century Park East, Suite 4000
Los Angeles, CA  90067
(310) 552-8500